### HARTWELL and others *vs.* ARMSTRONG and others.

The court will not be justified in interfering by the summary process of injunction to restrain the proceedings of commissioners appointed by an act of the legislature, for draining swamp lands, even though the commissioners err in judgment, in respect to the manner of performing their duties.

Unless the commissioners are violating the plain and manifest intent and object of the statute, or are proceeding in bad faith, the court will not interpose its authority, to suspend the work.

It is now well settled that the right of eminent domain remains in the government, or in the aggregate body of the people in their sovereign capacity ; and they have the right to resume the possession of lands in the manner directed by the organic and the statute law of the state, whenever the public interest requires it.

And it is for the legislature to judge of the degree of necessity which exists for the exercise of the right of eminent domain.

To authorize the exercise of this right, it is not requisite that the use and benefit to be derived shall be universal, nor, in the largest sense, even general. · Though confined to a particular district, it may still be *public.*

And though some parties are more benefited than others, this forms no objection to the use, if the public interest and convenience are thereby subserved.

An act authorizing commissioners to enter upon and appropriate the lands of individuals, for the purpose of draining a swamp, is a lawful exercise of the right of eminent domain, and the taking of such lands, so far as necesary, is a lawful taking of the same for a public use.

But there is an important condition connected with the exercise of the power of taking private property for public use, by the government, viz. the necessity of providing a just compensation to the owner.

This condition is fundamental and imperative, and can only be satisfied by making such provision as shall be in truth just, or, in other words, adequate and compensatory.

Where an act of the legislature, authorizing the drainage of a swamp, provided that the damages or compensation to be made to the owners of lands which should be entered upon and taken, should be collectible and payable by assessing the same upon the several *owners of the land drained,* according to the number of acres respectively owned by each ; *Held,* that this was not the just compensation contemplated and required by the constitution; and that consequently the act was unconstitutional and void.

THIS action was brought by several owners of land in what is called the Rome swamp, against the defendants as commissioners for draining the swamp, appointed by the act of April, 17, 1854, (*Laws of* 1854, *ch.* 396,) to restrain their proceedings.

The complaint, in addition to averring that the act was unconstitutional, because it assumed to take private property for public purposes, and also provided no compensation to the proprietors of the land taken, alleged that the defendants were proceeding improperly in the work, and to the injury of the plaintiffs ; and some testimony was taken on that head.

*Frost & Jenkins,* for the plaintiffs.

*C. Comstock,* for the defendants.

BACON, J. The grounds on which the plaintiffs ask the relief to which they suppose themselves entitled are two fold. *First,* they allege that the proceedings of the defendants are calculated to do incalculable injury to the farms of the plaintiffs, by cutting off and drying up their springs, and destroying the growth of their young timber, and that these proceedings are conducted in bad faith and with the intent to injure the plaintiffs, and benefit the lands of other parties not contributing to the expense of the work ; and *secondly,* they insist that the act under which the defendants are assuming to perform the work in question is unconstitutional and void, as depriving the plaintiffs of their property, not for any public use, and without providing them a just compensation therefor.

I shall spend no time upon the first branch of the plaintiffs' case, because there is no evidence whatever before me tending to show that the defendants are acting in bad faith ; and although there is some diversity of opinion whether the mode adopted by the defendants is the one best calculated to secure the result at which they are aiming, and whether the manner of its execution is the most judicious, yet this may be deemed at best a balanced question, on the evidence. Even if they err in judgment, a court would hardly be justified in interfering by the summary process of injunction to restrain their proceedings. Unless the defendants are violating the plain and manifest intent and object of the statute under which they are acting, or are proceeding in bad faith, the court should not interpose its au-

thority to suspend the work. In either aspect, I see no sufficient ground, as disclosed by the evidence, to entitle the plaintiff to the relief they ask under the first head of their complaint.

The more important question, as it was the one most elaborately and ably argued by the counsel on both sides, respects the inquiry whether the act of April 16th, 1854, under which the defendants are carrying on the work of draining the Rome swamp, is not a violation of the constitution, and therefore void. The plaintiffs' counsel insists that the act is a violation of the constitutional inhibition against taking private property, because, (1.) It is not taken for a *public use* ; and (2.) Because no *just compensation* is provided for the parties whose property is taken.

I. That the property of A. cannot be taken and appropriated to the use of B., however beneficial the change may be; and that the land of private citizens cannot be occupied by the government or any subordinate functionary clothed with legislative authority, under the pretense or the claim of improving it for the benefit of the occupant or his neighbors, requires no argument to demonstrate. It is by no means easy, however, to define the precise boundaries which limit the right to appropriate private property for public use ; or, in other words, to determine when the use shall be deemed public, and when not. It is insisted by the counsel for the plaintiffs that the purposes for which the property is taken in this case are not public, because the benefit is limited to, and the expense assessed upon, a few individuals. But how are we to determine the number to whom the benefit will be confined? In the case of draining an extensive swamp, we can readily conceive that the public health may be favorably affected, throughout a wide region, within and bordering upon the district where the work is carried on, and it surely is for the public benefit that a large tract of land should be reclaimed from the condition of a useless morass, and added to the agricultural resources of the state. But the question returns upon us, who is to judge of the degree of necessity which exists, and which alone will warrant the action of the legislative authority in determining that private property may

Hartwell *v.* Arimstrong.

be taken for public uses ? It is now well settled, if there ever has been any well founded doubt upon the proposition, that the right of "eminent domain" remains in the government, or in the aggregate body of the people in their sovereign capacity, and they have the right to resume the possession in the manner directed by the organic and the statute laws of the state, whenever the public interest requires it. The answer to the question I have proposed, is perhaps no where better given than by the late chancellor of this state in the leading case of *Beekman* v. *The Saratoga & Schenectady Rail Road Co.* (3 *Paige*, 73.) "If the public interest can in any way be promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain, and to authorize an interference with the private rights of individuals for that purpose." He adds, "upon this principle, not only the agents of government, but also individuals and corporate bodies, have been authorized to take private property for the purpose of making public highways, turnpike roads and canals, of erecting and constructing wharves and basins, of establishing ferries, of *draining swamps and marshes*, and of bringing water to cities and villages. In all such cases the object of the legislative grant of power is the public benefit derived from the contemplated improvement." The use and benefit is not required to be universal, nor, in the largest sense, even general. If it is confined to a specific district, it may still be *public*. If some parties are more benefited than others, this forms no objection to the use, if the public interest and convenience are thereby subserved. Isolated and individual action will rarely secure the public and general result which the legislative power is invoked to accomplish; and, in view of all the facts in this case, it is to be assumed that the legislature adjudged that the public necessity or utility justified the exercise of the right of resumption, and that the exigency existed which authorized the act in question. I do not say that a case may not exist of such palpable and gross invasion of private rights, unjustified by any semblance of pub-

lic necessity, that it would be the duty of the courts to interfere for the protection of such rights, by pronouncing the act a violation of the salutary principle which was designed to hold the legislative authority in check.    But the case must be very clear to warrant this interference.

On this part of the case, it is pertinent also to remark, that for the last fifty years, at least, the legislature has exercised the power in question here, by passing laws from time to time, authorizing, in various forms, the draining of swamps and marshes, and the reclaiming of submerged lands.    More than twenty such acts will be found in the session laws of the state, commencing as early as 1804, and continuing at various intervals down to the very last session of the legislature, when the act in question was passed.    This course of legislation is by no means conclusive when a constitutional question arises, which may never have been agitated in the courts, under any of those acts.    And we have been admonished by more than one decision that no length of time, in which a course of legislation has been continued, will protect any law from the condemnation of the judicial tribunals, when its conflict with the constitution is brought distinctly to the test.    (*See opinion of Bronson, J. in Taylor* v. *Porter,* 4 *Hill,* 140.)    While, therefore, it is not affirmed that these acts may be appealed to as decisive of the power of the legislature to pass them, and that they are not within the constitutional objection we have been considering, they nevertheless do lend some strength to the argument that a power so long exercised, in such diversified forms and various localities, may be deemed settled, as applied to the subject we are now considering.    Looking then at the principle which lies at the foundation of the right of the government to take private property for public use by an appropriate act of legislation, and the end which in this case may be fairly deemed the object and intent of the act, I shall find no difficulty in maintaining it as the lawful exercise of the right of eminent domain, and holding that the taking of the lands of these plaintiffs, so far as it was necessary to enter upon and appropriate them for the purpose intended in this case, was and is a lawful taking of the same for a public use.

II. But there is an important condition connected with the exercise of this power on the part of the government to take private property for the public use; and that is, the necessity of providing a *just compensation* to the parties whose property shall be thus appropriated. This condition is fundamental and imperative, and can only be satisfied by making such a provision as shall be in truth "just," or, in other words, adequate and compensatory. "The principle," says Ch. J. Savage, (*Matter of Canal street*, 11 *Wend.* 154,) "that private property shall not be taken for public use without just compensation is found in the constitution and laws of this state, and has its foundation in those elementary principles of equity and justice which lie at the root of the social compact." And this provision must be made cotemporaneously with, and as a part of, the act which authorizes the appropriation. For, in the language of Ch. Walworth, (18 *Wend.* 17,) "Before the legislature can authorize the agents of the state and others to enter upon and occupy, or destroy or materially injure, the private property of an individual, except in case of actual necessity which will not admit of delay, *an adequate and certain remedy* must be provided, whereby the owner of such property may compel the payment of his damages or compensation, and he is not bound to trust to the justice of the government to make provision for such compensation by future legislation." And Kent, (2 *Com.* 389,) recognizes the same doctrine when he says, "a provision for compensation is a *necessary attendant* on the due and constitutional exercise of the power given to deprive an individual of his property without his consent, and the principle is founded in natural equity, and is laid down by jurists, as an acknowledged principle of universal law."

Bearing these principles in mind, and that by the term "just compensation," as used in the constitution, is to be understood "a fair equivalent in money—a *quid pro quo*, a recompense in value for the property taken," (*Per Mason, senator*, 18 *Wend.* 35;) and remembering also that when private property is taken for public use by right of eminent domain, it is taken not as the owner's share of contribution to a public burthen, but as so much

beyond his share—let us see whether the act of the legislature, under which the proceedings of the defendants in this case have been taken, fulfills the constitutional requirement on that subject. By the 3d section of the act of April 17th, (*Session Laws of* 1854, *p.* 1000,) it is made the duty of the commissioners to assess the costs and expenses of the survey and the cutting of the ditches, and to apportion the amount among the several owners of lands to be drained, *according to the number of acres respectively owned by each.* This provision, it will be seen, devolves the whole expenses upon the parties owning the lands to be drained; and that not in the ratio of relative benefit, but simply upon a property basis, and by an equal assessment upon every acre throughout the swamp. The rule is highly objectionable in respect to the mode of providing for the expenses, but is probably within the scope of the legislative discretion as one form of the exercise of the taxing power. These burthens never can be very equally adjusted, and there is no glaring injustice in requiring those persons to pay the expenses, who are supposed to receive an equivalent in the enhanced value of their own adjacent property. On examining the act further, to ascertain what provision has been made for the damages or compensation to be made to the owner whose lands are entered upon and taken, we find the 11th section declares, that for any damages done to the owner or owners of such lands, &c., the commissioners shall make just compensation; and after providing for their appraisal in the proper mode, it is declared that such damages, and the costs of assessment and the *per diem* of the commissioners, shall be duly certified and " assessed and collected as part of the expenses of the drainage authorized by this act." The effect of the provision is to make the damages or compensation to be collected and payable precisely as the expenses are, to wit, by assessing the same upon the owners of the land, according to the number of acres owned by each. But is this the " just compensation" contemplated and required by the constitution? Most obviously, it seems to me, it is not. The taking of land necessary for the work, and the dispossession of the owner's right and title thereto, is only to be vindicated on the ground

Hartwell *v.* Armstrong.

that it is required for *a public use.* If the improvement is required for the public benefit, upon what principle can the public benefited by the appropriation, be exempted from their proper contribution to the just indemnification of the parties whose property has been taken? The land appropriated is not the owner's share of a contribution to a public burthen, but is so much above and beyond his share. He should be compensated, therefore, and the compensation should be made in good part, if not entirely, by those who are benefited by the work accomplished, either in the increased salubrity of the surrounding region, or the enhanced value of the lands which lie in the immediate neighborhood. But by the operation of this section, the owner not only loses his land, but is compelled to pay a portion of the very damages he has sustained by such loss and the other consequential injuries he may have suffered thereby.

The money which is supposed to satisfy the damages suffered by the owner may, in one sense, be said to find its way into one of the pockets of the proprietor; but to accomplish that trick of legal legerdemain, it must first be taken out of the other. Is this the "just compensation" the constitution contemplates? Does it practically do any more than

> "Keep the word of promise to the ear,
> To break it to the hope."

Besides, the burthen will of necessity be very unequally apportioned among those who are doomed to bear it. It is incredible that every owner of land in the swamp will suffer equal injury and receive equal benefit from the work in question; and the testimony in this case shows that such is not the fact. A. is the owner of 20 acres, which is a mere morass, having no available springs upon it, and no growth of timber which the progress of the work uproots and destroys. B., on an adjoining lot, has both springs indispensable for the uses to which he is applying his already partially reclaimed land and a growth of young timber, very valuable for farming purposes. And yet, under the law as it stands, B. pays precisely at the same rate, as a compensation towards the damages he has suffered, that A. does, who has not only suffered no injury, but has been greatly benefited by

the appropriation of the land and the execution of the work. This clearly is no just compensation, but a most inequitable distribution of the burthens, which ought to be in some proximate proportion to the benefits.

It is urged by the counsel of the defendants that the act in question follows the precedents of prior legislation on the same subject, and is formed on the model of various acts which have authorized similar works. I have looked through most of the acts on this subject in our session laws for many years, and it is true that in a great majority of cases no provision whatever has been made for ascertaining or paying the compensation required to be made. These laws have been probably acquiesced in by the parties who were interested in or affected by them, and no question has been made in the courts, as far as I am aware, respecting their constitutional validity. If there had been, I am unable to see how they could have escaped judicial condemnation. But this has not been the invariable course of legislation on this subject; for on examining the act of April, 1816, for draining the great marsh on the Caneseraga creek, I find an express provision, that in case any person shall suffer injury or damage by occasion of the canal and drainage of the land, his damages shall be ascertained by the commissioners, and assessed on the proprietor of such lands " as would in any wise be benefited or made more valuable, by reason of the canal" to be cut for the purpose of draining the said swamp. And the same provision was made in reference to the expenses, which were to be assessed in like manner, " having reference to the benefit to be received by each of the proprietors."

So also in the act of April, 1825, for draining the Cayuga marshes, it was made the duty of the commissioners, when the work should be completed, to prepare an assessment roll and valuation of the land reclaimed, and *all other lands* which in their opinion shall have been increased in value by the lowering of the waters of the marsh, and assess a tax to pay for the work, " in an equal and just measure according to the valuation in the assessment roll," adequate to meet the expenses of the work. And a substantially similar provision is contained in the act of

Hartwell v. Armstrong.

February, 1822, for lowering Onondaga Lake, and draining the marsh lands in the town of Salina.

These acts contain the proper provisions, and are, it seems to me, founded on the true principle which ought to govern legislation on the subject of appropriating private property for public uses. Nothing could have been easier than to have inserted in the act we have been considering, a section containing a provision similar to the one found in these acts, to which I have referred, and thus have secured all the benefits which are expected to, and doubtless will, flow from a judicious discharge of the duties devolved upon these defendants, while it preserved all the constitutional guaranties which have been thrown around the rights of the private citizen. Future legislation may possibly, even now, remedy this omission, giving validity to what has already been done, but providing for that just indemnity and compensation to which it shall be found the parties are ultimately entitled. But whether this be so or not, the duty of the courts in a case where their interposition is invoked to stay proceedings under a law which violates a plain constitutional provision, is clear and imperative, and must be performed.

, The plaintiffs are accordingly entitled to the relief demanded in the complaint, restraining the defendants from further proceedings under the act in question. But as the defendants have been charged with a public duty, under the apparent sanction of an act of the legislature, and have acted in entire good faith, the judgment must be without costs against them.

[ONEIDA SPECIAL TERM, December 4, 1854. *Bacon*, Justice.]