## Case No. 14,496.

UNITED STATES v. BAIN et al.

[3 Hughes, 593.] [1]

Circuit Court, E. D. Virginia. Aug., 1879.

WHARVES—GOVERNMENT PURCHASE—DOCK—STATE
LEGISLATIVE ACT—INJUNCTION.

1. The town of Gosport was sold to private purchasers by the state of Virginia, according to a plat of lots and streets. The streets were at right angles with the Elizabeth river, and terminated on the river. The law of Virginia gives title to riparian owners as far as low-water mark. It authorizes riparian owners to extend wharves from the land to the channel, provided navigation be not thereby obstructed. The United States became subsequent purchaser, from a private owner, of one of the lots of land in Gosport, bordering on Elizabeth river, and built a wharf out from its own lot, and from an adjoining lot to the channel. One of the streets of Gosport (which is part of the town of Portsmouth) is called "Randolph Street." The lot of the United States bordered on this street from a foot or a few feet above high-water mark, to low-water mark, and the government's wharf is in front of its lot, and on a line with the side of Randolph street.

2. The legislature of Virginia, by special act authorized the town of Portsmouth to lease out the space between the end of Randolph street to the channel of Elizabeth river, for the purpose of a dock, which license was exercised by the town by a lease to defendants, and a dock was made which brings deep water from the channel to the street, and extends along the side of the wharf of the United States.

3. This dock being private property, is sometimes closed by its proprietors by a chain boom, and the United States is thereby sometimes prevented from using the side of its wharf, and confined to the use of its front.

4. A bill was filed on behalf of the United States by the United States attorney, praying for an order of injunction restraining the proprietors of the dock from obstructing the United States in the use by its vessels of the side of its wharf, the question being on the validity of the act of the legislature of Virginia authorizing the lease to private persons of the space occupied by the dock. *Held*, that the state had power to authorize such a lease, that the lease was valid, and that the bill must be dismissed.

[Bill in equity by the United States against George M. Bain, Jr., and others.] The bill complains of the defendant's dock in front of Randolph street, in Gosport, as an obstruction of a highway, and prays for an appropriate restraining order. Before the year

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

1792 the site of the town of Gosport (now a part of the city of Portsmouth) was a common belonging to the state of Virginia. In that year the legislature directed the site to be laid off for a town, according to the present plan of streets and lots, and the lots to be sold. Amongst other lots sold by the treasurer of Virginia, on the occasion, was the one now owned by the United States, and mentioned in its bill of complaint in this cause, which is in the use of its lighthouse establishment as a depository for buoys and materials and implements of the lighthouse service. Nothing is said in the act of the general assembly of Virginia, directing the sale of lots in Gosport, about water privileges; nor do the deeds by which these lots were conveyed make mention of such privileges. The lots were described by their numbers as laid down on the general plat of the town, and the purchasers took title, as implied by the lots being sold by numbers, in the plat of a proposed town. Some of them, and amongst others this lot of the United States, mentioned in the bill of complaint, fronted on Elizabeth river. The deed from the state to the original purchaser of this lot is not in evidence. The deed to the United States, made in 1870, gives the following boundaries: "Beginning at a point on the south side of Randolph street, 106 feet 4 inches eastwardly of the east side of Water street; from thence running southwardly, and parallel with Water street, 67 feet 4 inches; thence westwardly, parallel with Randolph street, 106 feet 4 inches to the east side of Water street; thence southwardly along the east side of Water street 80 feet 8 inches; thence eastwardly, and parallel with Randolph street, to the Elizabeth river; thence northwardly along Elizabeth river 148 feet to Randolph street; thence westwardly, and along the south side of Randolph street, to the beginning." We may presume that all the deeds,

through which this title has come to the United States, have used like terms of description. It would seem from these terms that the fee in half the streets did not pass to lotholders abutting on them, nor anything but an easement in them.

The following is a plan of the lot as thus described in the deed, and as extended by a wharf from the shore to, or near to, the port warden's line in Elizabeth river.

It will be observed that the description of the lot, by boundaries, in the deed, does not give the depth of the lot measuring from Water street to Elizabeth river. It does not, by any terms, express or implied, convey title further than to the shore of Elizabeth river.

The title of a riparian owner, on the tide-waters of Virginia, extends to low-water mark; subject, however, as to the space between high and low water mark, to the jus publicum of all the people of the state, who are allowed, by law, the privilege of fishing, hunting, and fowling on this space, and on the shores and beds of these tide-waters. See sections 1, 2, c. 62, Code Va. This space, and these beds and shores, are subject, also, of course, to the usual public right of navigation. But it is provided by section 59 of chapter 52 of the Code, that any owner of riparian land may extend a wharf into the water as far as desired, provided that navigation be not obstructed, nor the private rights of other persons impaired. As to the cities of Norfolk and Portsmouth, it is provided by a law of the state, passed February 18th, 1875, that "the harbor commissioners of these cities shall have full power to regulate and define the port warden's line along the water-front of the two cities, and the Elizabeth river and branches thereof, for five miles above and below the limits of the said cities; that they shall have power to fix the lines along said rivers within which riparian owners may erect wharves, docks, and other

proper erections and fixtures for commercial and manufacturing purposes; that they shall have authority to cause the removal of any wharf, dock, wreck, or other obstruction to navigation, or that may, in their opinion, be injurious to the harbor, at the expense of the owner or owners, or the parties causing the obstructions; provided, that the right of any owner or owners of wharves, whose lines have heretofore been fixed by authority of state legislation, are in no wise to be disturbed." It does not appear in evidence that the harbor commissioners have ever objected to the action of the defendants in this cause, either in constructing or managing their dock at the end of Randolph street. Their rights accrued before the passage of the law.

The United States has extended a wharf from its lot as described, out into the river to, or nearly to, the port warden's line, as marked in the above plat. This extension is about 170 to 175 feet beyond the natural shore. It will be seen from this plat that the lot of the United States, considered as bounded by low-water mark, abuts very little, if any at all, on Randolph street; indeed, the bill of complaint alleges that "at the time the said lot of land was purchased by the United States, so much of Randolph street as forms a portion of the boundary of the said lot was covered by mud and water, and that that portion of it was afterwards dredged out by them." In fact this portion was under water and wholly below low-water mark. In 1871 the legislature of Virginia, by special act, authorized the city of Portsmouth, which includes the town of Gosport, "to lease out for a term of years, to private parties or corporations, 'the ends of the streets running to Elizabeth river,'" with certain exceptions. By "ends of streets" is meant the space in front of streets, extending from low-water mark out into the river to the front line of the docks and wharves, which is usually the port warden's line.

On June 28th, 1875, Bain & Bro. petitioned the council of Portsmouth for a lease of the ends of certain streets in Gosport, adjoining lots of theirs, for a term of twenty-five years; stating that their object was to open docks wider than the streets, by encroaching upon their own property, and of sufficient depth of water to admit large ships to come in and load in them; expressing the belief that "the proposed improvement would redound to the advantage of the city commercially and financially." By deed, which embodied this petition, the city of Portsmouth did make the lease of the ends of Randolph and one or two other streets to Bain & Bro. at a certain annual rent, for twenty-five years, and Bain & Bro. say, in their answer in this cause, that they "have converted the end of Randolph street into a dock with water twenty-two and eighteen feet deep, so that ships and vessels of large draft may lie at ease in it; and that it has been made so by dredging it out at their own cost and expense, the space having been previously covered with water, though not deep." The Bains made a sub-lease of this dock to O. O. Vandenberg, one of the defendants in this suit, who is a purchaser of timber for shipment to Europe, and who uses this dock, and a wharf and shed of the Bains contiguous to it, for the purpose of mooring logs and storing lumber preparatory to shipment abroad. Vandenberg occasionally confines his logs in the dock by means of a boom chain stretched across its mouth. This boom, during the periods when thus stretched, prevents the vessels of the lighthouse establishment from entering the dock, and confines them to the front of the wharf of the government. Vandenberg is willing to lend, and has proffered the key of the chain buoy to the officers of the government, so that they may at all times enter the dock and lay alongside of the government wharf; but these officers object to the chain and logs as a nuisance, and the government brings this bill to restrain Vandenberg and Bain & Bro. from further obstructing the use of the dock, which the bill claims to be a street and highway. Before the lease was made by Portsmouth to Bain & Bro., the United States had expended about $1,300 in dredging along the side of its wharf in this dock. They made this expenditure without securing any right which might arise from so doing, either from Portsmouth or Virginia.

The bill charges that the defendants are obstructing, and that they often entirely close, by means of logs and other impediments, the entrance to Randolph street from the Elizabeth river, so that it cannot be used by the United States and the general public for the purposes for which the said street was acquired and established. The bill complains that the said pretended lease from the city council of Portsmouth is utterly invalid; that the authorities of the said city had no power or authority to make or enter into the same; and that no interest inconsistent with the rights of the United States and the general public to use the said street as a common highway was acquired under the same, and that no interest inconsistent with such rights was acquired by the said Vandenberg by virtue of the pretended lease to him.

The defendants, in their answer, allege, among other things, that the whole of said Randolph street upon which the lot of the complainant abuts, is now, and always has been, so far as they know, covered with water and mud, and no street for the passage of men on foot, or beast of burden or vehicles, has ever in fact existed in that part of the shore designated as Randolph street, which forms the boundary of the complainant's lot, either as alleged in the said bill or as laid down on said plat filed therewith; and that at present the whole of the space laid down as Randolph street, on which the complain-

ant's lot abuts, is a dock with water twenty-two and eighteen feet deep in it, and the defendants insist generally that the riparian rights of complainant are confined to the front of their lot and do not extend to the side of it.

L. L. Lewis, U. S. Atty.

W. W. Old, for defendants.

The following is the opinion of the court delivered by—

HUGHES, District Judge. The principal question of fact in the case is whether Randolph street extends farther than low-water mark. It may be conceded that the owner of lots adjoining the streets in Gosport derived from the state of Virginia the right of easement in them, and that the state could not in good faith take away that right except for some important public purpose. But it is quite clear that this claim upon the state belongs only to the owners of lots which abut on the streets. Does, then, the lot of the United States abut on Randolph street? A street is a way upon land, more properly a paved way, lined or proposed to be lined by houses on each side. It is confined to land, and ends on the shore or bank of the land at the border of the water. The deeds from Virginia to owners of lots in Gosport impliedly warranted the free use of the streets laid down on the plat of the town, and did not warrant the use of water, or land under water below low-water mark. When, therefore, the bill of complaint itself alleges that the portion of Randolph street bordering upon the lot and wharf of the United States was covered by mud and water, it admits that the street terminated as a street at Neville's north line, and does not reach to the lot of the United States.

We have, therefore, in this inquiry nothing to do with a street; nothing to do with "Randolph street" as an easement of the lot mentioned; which, as the bill virtually alleges, ceased to be a street when reaching this lot. This being so, it follows that the deed of Virginia to the purchaser through whom the United States derives title, contained no warranty of an easement in Randolph street as a street; and the state has violated no contract in its act allowing Portsmouth to lease out "the end of Randolph street."

The United States attorney seems to feel the stress of this view of the subject, and employs the term "highway" much more frequently than "street" in his argument. He thereby shifts the question into one, whether the owner of the government lot has any right to the use of a water-way in front of Randolph street. Notwithstanding what has been said, I think the deed implies that the lot contains a strip of land between Neville's lot and low-water mark. See accompanying plat. This strip is merely imaginary, if the language which has been quoted from the deed is true. If there be such a strip in fact, however, it is a very narrow one; and it is only the end of this very narrow strip abutting on the end of Randolph street which can give to the owner of the lot any special right in Randolph street, and in the supposed water-way in front of that street. The right in the street is not taken away by the lease to the defendants. It is only the right in the water fronting the street that is taken away; and this deprivation is the matter really complained of in the bill. But there is no warranty of the water-way expressed or implied in the deeds; and the right of the complainants in the water in front of Randolph street is only the jus publicum spoken of in the books, which is the right of the public to use the public waters of rivers and bays in commerce and trade, to pass and repass freely over them, and to enjoy the advantage from them which the public generally may do, as distinguished from that which is private, special, and proprietary. This is the right which is taken away by the action of Virginia and Portsmouth in the lease in question; and the proposition of the United States attorney, in his learned and elaborate brief, is, that a state of this Union has no power to take away the right of the public to the general free use of public waters, in the manner stated. If the proposition be true, the United States has itself violated the jus publicum by building its wharf in front of its lot, for the distance of some 175 feet out from low-water mark into the Elizabeth river which is a public highway between two commercial cities.

The United States owns the lot in question only by private tenure, and is before this court only in the character of a private corporation. It has built its wharf in front of its lot out into the river, either in violation of that jus publicum, upon the sanctity of which it insists in its bill, or else under the authority of a law of Virginia (section 59, c. 52, of the Code of Virginia). If the state had no power to authorize riparian owners to build wharves and bulkheads in rivers washing their lands in prejudice of the jus publicum, then the United States, as owner of its wharf, is here in the character of a wrongdoer, asking the abatement of an obstruction to its free use of a dock as owners of an adjoining wharf which it had no right to construct. If its proposition is true, it must itself go out of court as a trespasser without warrant of law upon the jus publicum in Elizabeth river.

But the proposition is not true. Whatever decisions may be found here and there, denying in special cases the power of the states of the Union over their highways and public waters, the overwhelming preponderance of authority is in favor of this power. True that this power is qualified by two provisions of the national constitution, one of which forbids a state from passing any law impairing the obligation of contracts, and

another of which gives to congress the right of regulating commerce and trade between the states. With these restrictions, it is easy to show that the power exists.

In Willson v. Blackbird Creek Marsh Co., 2 Pet. [27 U. S.] 245, the state of Delaware had authorized a company to construct a dam across the mouth of a navigable stream for the purpose, by shutting off the tides, of reclaiming a large body of marsh lands. The owner of a sail-vessel broke down the dam, and the company sued him for damages. The plea stated that the creek was navigable, in the nature of a highway, in which the tide ebbed and flowed, and denied the right of the state to authorize its closure by a dam. The case went to the supreme court of the United States, and that court, Chief Justice Marshall delivering its opinion, pronounced the law of the state to be valid. The court said of this law of Delaware, "unless it come in conflict with the constitution or a law of the United States, it is an affair between the government of Delaware and its citizens, of which this court can take no cognizance." An examination of the decision will show that it admits, as a proposition not needing argument, that the state had power to close a navigable water in its discretion, and that this power could not be questioned unless it was exercised in conflict with some positive act of congress passed in pursuance of its power "to regulate commerce with foreign nations and between the states."

In the case of Pennsylvania v. Wheeling Bridge Co., 13 How. [54 U. S.] 518, the state of Virginia had authorized the city of Wheeling to build a bridge across the Ohio river, and congress had passed laws regulating commerce and the running of steamboats upon that river. The city of Wheeling was building this bridge, which was charged to be an obstruction to navigation, and the judgment of the court upon a vast body of evidence taken on that point was, that the bridge would, in point of fact, be an obstruction to the navigation. The case was before the court twice. At its first hearing it decided the bridge to be an obstruction, and forbade the building of it. The court in its last decision, speaking of the first one, says: "The bridge had been constructed under an act of the legislature of Virginia; and it was admitted that the act conferred full authority upon the defendants for the erection, subject only to the power of congress in the regulation of commerce. It was claimed, however, that congress had acted upon the subject, and had regulated the navigation of the Ohio river, and had thereby secured to the public by virtue of its authority the free and unobstructed use of the same; and that the erection of a bridge, so far as it interfered with the enjoyment of this use, was inconsistent with and in violation of the acts of congress. and destructive of the right derived under them; and that, to the extent of this interference with the free navigation of the river, the act of the legislature of Virginia afforded no authority or justification. It was in conflict with the acts of congress. which were the paramount law. This being the view of the case taken by a majority of the court, they found no difficulty in arriving at the conclusion that the obstruction of the navigation of the river. by the bridge, was a violation of the right secured to the public by the constitution of the United States and laws of congress, nor in applying the appropriate remedy in behalf of the plaintiffs." The bridge had been completed before the first decision was rendered. Immediately upon its delivery steps were taken, which soon proved successful, for procuring from congress an act declaring the bridge a post road, and authorizing its owners to have and maintain it at the height at which it stood when condemned by the supreme court. The bridge was soon afterwards blown off by a hurricane, and an injunction was obtained from one of the justices of the supreme court forbidding its owners to rebuild it at the original height. It was built, nevertheless, in contempt of this order; and when the bill of injunction came on for regular hearing the supreme court, notwithstanding the contempt, receded from its former judgment, on the ground that congress had legalized the bridge, and dismissed the bill. The supreme court proceeded in both cases upon the "admission that the act of the legislature of Virginia conferred full authority upon the owners of the bridge for its erection, subject only to the power of congress in the regulation of commerce."

In the case of Martin v. Waddell, 16 Pet. [41 U. S.] 367. the court said (at page 410), through Chief Justice Taney: "When the Revolution took place the people of each state became themselves sovereign, and in that character hold the absolute right to all their navigable waters, and the soils under them, for their common use. subject only to the rights since surrendered by the constitution to the general government."

In Pollard's Lessee v. Hogan, 3 How. [44 U. S.] 230, the supreme court said: "The right of eminent domain over the shores and the soil under navigable waters, for all municipal purposes, belongs exclusively to the states within their respective territorial jurisdiction, and they, and they only, have the constitutional power to exercise it. But in the hands of the states this power can never be used so as to affect the exercise of any national right of eminent domain or jurisdiction with which the United States have been invested by congress."

In Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, the supreme court say: "Inspection laws form a portion of that immense mass of legislation which embraces everything within the territory of a state not surrendered to the general government, all which can be most advantageously exercised by the states

themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, etc., are component parts of this mass."

In Gilman v. Philadelphia, 3 Wall. [70 U. S.] 713, the power of the state of Pennsylvania to authorize the construction of a bridge across the Schuylkill river near its mouth, which would entirely prevent its navigation by a large class of vessels, was passed upon. It was held that an act of the state legislature giving the right to build the bridge, notwithstanding such effect, was valid.

In Conway v. Taylor, 1 Black [66 U. S.] 603, the legislature of Kentucky had granted to a person owning the entire.shore abreast of Newport, on the Ohio river, the exclusive right to land ferry-boats, plying across the Ohio river, on that shore. This right was assailed as contrary to the common right of landing there, and as a monopoly, and the act of the Kentucky legislature was attacked as exceeding the powers of a legislature of a state. But the supreme court of the United States said: "Rights of commerce give no authority to their possessor to invade the rights of property. * * * He cannot invade the ferry franchise of another without authority from the holder. The vitality of such a franchise lies in its exclusiveness. The moment the right becomes common the franchise ceases to exist. It is property, and rests upon the same principle which lies at the foundation of all other property. * * * There has now been three-quarters of a century of practical interpretation of the constitution. During all that time, as before the constitution had its birth, the states have exercised the power to establish and regulate ferries; congress never. We have sought in vain for an act of congress which involves the exercise of this power. That the authority lies within the scope of 'that immense mass' of undelegated powers which 'are reserved to the states respectively,' we think too clear to admit of doubt." See also Fanning v. Gregorie, 16 How. [57 U. S.] 534. Such is the uniform tenor of all the utterances of the supreme court on this subject, in cases too numerous to be cited here.

Similar decisions have been rendered by the United States circuit courts. In Spooner v. McConnell [Case No. 13,245], where the Ohio legislature had chartered a canal company, with the usual powers, and the company was about to obstruct the navigation of the Maumee river by constructing a dam in aid of the canal, the court held that the act allowing this proceeding was within the power of the state; and this, notwithstanding an express provision of the ordinance of 1787, that the navigable waters of the Northwestern Territory shall be "common highways and forever free." The same was held in Palmer v. Cuyahoga Co. [Id. 10,688]. In

the case of The Passaic Bridges. Appendix to 3 Wall. [70 U. S.] 782, the state of New Jersey had authorized certain railroad bridges to be constructed over the Passaic river which entirely obstructed its navigation by a large class of vessels, very seriously impairing the commerce of Newark. The validity of the act was assailed in a bill praying for an injunction to restrain the railroad company from erecting the bridges. Judge Grier dismissed the bill, saying, in the course of his opinion, "whether a bridge over the Passaic will injuriously affect the harbor of Newark, is a question which the people of New Jersey can best determine, and have a right to determine, for themselves. If the bridge be an inconvenience to sloops and schooners navigating their port, it is no more so to others than to them. I see no reason why the state of New Jersey, in the exercise of her absolute sovereignty over the river, may not stop it up altogether, and establish the harbor and wharves of Newark at the mouth of the river."

There have been quite recent cases, involving the same principle, in the supreme court of the United States. In U. S. v. Fox, 91 U. S. 367, that court says: "It is an established principle of law everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other modes, is exclusively subject to the government within whose jurisdiction the property is situated. McCormick v. Sullivant, 10 Wheat. [23 U. S.] 202. The power of the state in this respect follows from her sovereignty within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the general government." Fox had devised his property to the United States to aid in paying off the national debt. The law of New York prohibited devises except to natural persons. The supreme court held that the state law must prevail, and that the United States could not take the property devised. See Kohl v. U. S., 91 U. S. 367. See, also, Judge Sutherland's opinion in People v. Kerr, 37 Barb. 412, where that learned judge, after an elaborate review of the authorities, concludes with this language: "It may be stated as a well-settled American doctrine, that the state legislatures have unlimited power over public rights in a highway, and can obstruct, modify, impair, or extinguish them, as to any highway or portion of a highway, except so far as the state power is qualified by the commercial clause of the constitution of the United States, without making any compensation to individuals for resulting or consequential damages."

In the light of these authorities can there be any doubt of the power of the state of Virginia to authorize the lease of the space between the ends of the streets of Portsmouth and the navigable channel, to men of enterprise and capital willing to undertake

the expense of constructing spacious docks capable of floating the great ships of commerce? The space between the land and the channels of streams needs either to be wharfed or docked to fit them for commerce. Either the water must be deepened by docks, up to the land, or else the land must be extended, by wharves, to the water channel. The United States did the latter with its lot at Gosport by warrant of a general state law. The defendants here did the former by warrant of a special state law. It was competent for the state to pass either law, having "absolute sovereignty over the river," and "the exclusive power over the shores of her navigable streams and the soil under their waters."

This question has been so conclusively settled by the federal courts of the United States that it would be a useless task to examine the decisions of the state and of the English courts upon it. Those of a few of the states have undoubtedly denied this power, and there are many English decisions which deny a similar power to the king. See, for example, Attorney General v. Parmeter, 10 Price, 411. But no English decisions can be found which deny to parliament the absolute power over this subject; and those state courts which have denied it to state legislatures have followed the English precedents which refer only to the king rather than to those which refer to the parliament. "There was a time when the crown could grant away to the subject the royal demesnes and landed possessions at pleasure; but now by statute of 1 Anne, c. 7, § 5, such royal grants are prohibited, and the crown lands cannot be so aliened. So much, therefore, of the seashore as has not been actually aliened by grant, and bestowed on lords of manors and other subjects, still remains vested in the crown incapable of alienation. Hall's Seashore, p. 106. But where the crown has acted under the authority of parliament, it may part with them." Reg. v. Edulgee Byramjee, 5 Moore, P. C. 294.

The leading case on this latter point is King v. Smith, Doug. 441, decided by Lord Mansfield. The law has been finally settled in England as to the power of parliament, in Attorney General v. Chambers, 4 De Gex, M. & G. 206; Gann v. Free Fishers of Whitstable, 11 H. L. Cas. 192; and Duke of Buccleuch v. Metropolitan Board of Works, L. R. 5 Exch. 221. A very instructive case is Stevens v. Pattersen & N. R. Co. [34 N. J. Law 532]; and in Virginia, Power v. Tazewells, 25 Grat. 786. See, also, Rundle v. Raritan & D. Canal Co., 14 How. [55 U. S.] 80. In dealing with the case at bar, I am bound by the decisions of the supreme court of the United States, and, following them, I must hold that the law of the state authorizing the leasing of the end of Randolph street was valid; that the defendants were fully empowered to construct a dock there,

and entitled to the exclusive control of it; and are not committing a nuisance in using and controlling it, in the absence of objections by the harbor commissioners. Even if all this were not so, the principle is well settled that acts authorized by law are not nuisances such as equity can relieve against, and on that principle the bill would not lie, and the complainant must be left to his remedy at common law. See People v. Kerr, 37 Barb. 418; Georgetown v. Alexandria, 12 Pet. [37 U. S.] 98; Crowder v. Tinkler, 19 Ves. 619. Whatever harm results from acts authorized by law is damnum absque injuria. See Weeks, D. A. Inj. § 48, and cases there cited, viz.: Trustees of First Baptist Church v. Utica & S. R. Co., 6 Barb. 313; Hatch v. Vermont Central R. Co., 2 Williams (Vt.) 142; Stoughton v. State, 5 Wis. 291; Com. v. Reed, 34 Pa. St. 275; Hinchman v. Paterson Horse R. Co., 2 Green [17 N. J. Eq.] 75; Samuels v. Mayor, etc., of Nashville, 3 Sneed, 298; Delaware Division Canal Co. v. Com., 60 Pa. St 367; Williams v. New York Cent. R. Co., 18 Barb. 222 (but see s. c., 16 N. Y. 97); Saltonstall v. Banker, 8 Gray, 195; Mazetti v. New York & H. R. Co., 3 E. D. Smith, 98; Hartwell v. Armstrong, 19 Barb. 166; Hodgkinson v. Long Island R. Co., 4 Edw. Ch. 411; and Parsons v. Travis, 1 Duer, 439.

As well, therefore, on the question of jurisdiction, as on the merits, the bill must be dismissed.