SMEATON and another vs. MARTIN and others.

*March 15 — April 4, 1883.*

*Eminent Domain — Highways — Drains.*

1. The taking of land for a ditch to drain a public highway is a taking for a public use.

2. The necessity for the taking of land by right of eminent domain is to be determined by the legislature, and it may delegate the exercise of such right to town supervisors or overseers of highways.

3. Where private property is taken for public use, by a town or municipal corporation which is made liable to the owner for any damage sustained by reason of such taking, the taxable property of such town or municipality constitutes a pledge or fund to which such owner may resort for payment in the manner prescribed by statute; and where a method of enforcing payment out of such pledge or fund is provided, just compensation for the property taken is made, within the meaning of the constitution, although the payment is not made before the property is actually taken, Secs. 1236, 1237, R. S., *held* constitutional.

APPEAL from the Circuit Court for *Waukesha* County. The case is thus stated by Mr. Justice CASSODAY:

"On June 29, 1882, the plaintiffs, as tenants in common of a farm of 160 acres in the town of Vernon, Waukesha

county, obtained a preliminary injunction upon their verified complaint, alleging, in effect, that on June 15, 1882, and subsequently, the defendants, claiming and assuming to act as the supervisors of said town and of the town of Waukesha, entered upon said farm without authority, and wrongfully commenced and continued the excavation of a deep ditch thereon, and were thereby drawing the water down upon and flooding the plaintiffs' said lands and injuring their crops, compelling the plaintiffs to bring a multiplicity of suits, and for which there was no adequate remedy at law, and asked that such injunction be made perpetual.

" The defendants moved to dissolve the injunction upon their verified answer, denying certain allegations of the complaint, and alleging, among other things, in effect, that three of them were the supervisors of said town of Vernon and the other three of the town of Waukesha, adjoining said town of Vernon on the north, and between which towns was a highway running east and west, and that between said highway and the farm of the plaintiffs was eighty acres of land which had belonged to William Stillwell, but the west three fourths of which then belonged to James Stewart and the balance to August Lafer, and that the same was low, swamp land, which necessarily required draining to make it available for farming purposes, and that the said highway ran through such low, swamp land and necessarily required to be drained to make it available for the purposes and uses of a highway; that on November 26, 1863, said William Stillwell caused to be dug and opened a ditch running from said highway across his said low, swamp lands in a southerly direction until it came to the north line of the plaintiffs' said land, for the purpose of draining his said low, swamp lands, together with with said highway; that the natural flow of the water from said highway and said Stillwell's low, swamp land through said ditch was in a southerly direction to the north line of the plaintiffs' land, and from thence said water, together with

the water that gathered upon and flowed off from said end of the plaintiffs' land in a valley that led to a natural stream a quarter of a mile south of the south line of plaintiffs' land, except that there was a strip of land about twenty rods wide on the north side of the plaintiffs' land two feet higher than Stillwell's land, and the land of the plaintiffs south of it, and through which strip it was necessary to dig a ditch in order to drain Stillwell's land and said highway through said valley to said natural stream; that on November 26, 1863, on the application of Stillwell, an inquisition was duly found, under the statutes, for the opening and digging of a ditch through the lands of the plaintiffs in a southerly direction, according to a map, plans, and specifications thereof duly made and filed; and thereupon, and in 1863, Stillwell dug out and opened said ditch in accordance with said inquisition, map, plan, and specifications, the north end of which connected with the south end of the ditch dug and opened through and across Stillwell's land, whereby Stillwell's low, swamp land and said highway were drained so as to render Stillwell's land available for agricultural purposes, and said highway available for the purposes and uses of travel, and the said drain was kept open and unobstructed from 1863 to 1878 as a watercourse, when the plaintiffs placed temporary obstructions in the same near their north line, and which obstructions were from time to time removed by Stillwell and replaced by the plaintiffs, and gradually said drain became filled up with sediment for its whole length, and thereby caused the overflow of said Stillwell's land and said highway until the spring of 1882, when the plaintiffs filled up the drain permanently, and peremptorily refused to allow the same to be opened, which resulted in submerging Stillwell's land and overflowing said highway so as to render the same impassable and unfit for the uses and purposes of a road.

" The answer further alleges that complaint in writing was

made to the said supervisors of Vernon by James Stewart, to the effect that he was a resident land-owner of said town, that the ditch or watercourse described had been so obstructed that the natural flow of water along the same was prevented by the plaintiffs, through whose land the same had been laid out and opened, by filling the same with stones, logs, rails, earth, and other substances, in the spring of 1878, in the spring of 1879, in the spring of 1880, in the spring of 1881, and in the spring of 1882, and that because thereof great damage and inconvenience had been put upon him and many other citizens of the town, as well as the general public, whereby he felt deeply aggrieved and wherefore he requested the immediate removal of said obstructions, under the provisions of the statute in such case made and provided; that thereupon, on May 16, 1882, the said supervisors made an order reciting in effect that, it appearing satisfactorily to them that all the material allegations in said Stewart's complaint were in fact true, and that such filling up and obstructing of said ditch had caused, and did then cause, the overflow of the highway on the north side of Stillwell's land to such an extent as to seriously interfere with and impede the travel thereon, and directing that said obstructions in said ditch be immediately removed, so as to cause the free and unrestrained flow of the water therein, the same as though said obstruction had not been placed therein, and so as to prevent any future overflow of said highway, or the lands owned and occupied by said Stewart (being the west three fourths of the Stillwell eighty) or any other person or persons whose lands are overflowed by reason of such obstructions being placed in said ditch; that it was thereby further ordered that the overseer of highways in the road district where said road was located, and said Stewart, or either of them, their agents or servants, enter upon said lands and remove said obstructions, as thereinbefore directed; that the same was thereupon done

in pursuance of such order, and that the doing thereof constituted the acts complained of.

"The allegations of the answer were supported by five affidavits, and said complaint and order. The plaintiffs replied, and denied each and every allegation of the answer constituting a counterclaim, and also presented certain affidavits upon the motion, denying some statements in the answer and explaining others. On September, 13, 1882, the court dissolved the injunction previously granted, and from the order entered in that behalf the plaintiffs appealed."

For the appellants there was a brief by *P. H. Carney* and *F. W. Monteith,* and oral argument by *Mr. Monteith.* To the point that ch. 57, R. S. 1858 authorized the taking of private property for a private use, and was therefore unconstitutional, they cited: Const. of Wis., art. I, sec. 13; *Osborn v. Hart,* 24 Wis., 89; *Sadler v. Langham,* 34 Ala., 311; *Dickey v. Tennison,* 27 Mo., 373; *In re Albany St.,* 11 Wend., 151; *In re John and Cherry Sts.,* 19 id., 676; *Bloodgood v. M. & H. R. R. Co.,* 18 id., 59; Revisers' Notes, 1878, § 1388; *Wilkinson v. Leland,* 2 Pet., 657; *Taylor v. Porter,* 4 Hill, 140; *Varick v. Smith,* 5 Paige, 159; *Beekman v. S. & S. R. R. Co.,* 3 id., 73; 2 Kent's Comm., 339, 340.

*D. H. Sumner,* for the respondents.

CASSODAY, J. We assume, for the purposes of this appeal, that the plaintiffs were entitled to an injunction, and that the same was improperly dissolved, unless the opening of the drain by order of the supervisors was justified by their proceedings under the statute. The learned counsel for the plaintiffs insist that the statutes under which the ditch was first constructed, in 1863, were invalid because they authorized the taking of private property for private use. Ch. 57, R. S., 1858, and ch. 54, R. S. There may be some doubt about the validity of those statutes. In addition to the au-

thorities cited by counsel, we would refer to *Consolidated Channel Co. v. Central Pacific R. R. Co.*, 51 Cal., 269; *Waddell's Appeal*, 84 Pa. St., 90. But the validity of the drainage acts of North Carolina was sustained in *Brown v. Keener*, 74 N. C., 714, where it was held that "the public power (legislative power) extends to providing for every object which may be reasonably considered necessary for the public safety, health, good order, or prosperity, and which is not forbidden by some restriction in the state or federal constitution, or by some recognized principle of right and justice found in the common law." To the same effect, see *In re Drainage Pequest River*, 39 N. J. Law, 433; *Hartwell v. Armstrong*, 19 Barb., 166; *Matter of Ryers*, 72 N. Y., 8; Mills on Em. Dom., §§ 16, 354. But it is not necessary here to pass upon the question, and we therefore reserve it for future consideration.

It seems to be conceded that the road in question was a public highway, within the meaning of the statute. Being a public highway, it was under the care and supervision of the supervisors of the town. It was their duty, therefore, to give directions for repairing the same, and to cause all obstructions to be removed therefrom, and to require the overseers of highways for that district, from time to time and as often as they should deem necessary, to perform any of the duties required of them by law. Subd. 1 and 6, sec. 1223, R. S. The statutes made it the duty of the overseers of highways in that district to repair and keep the same in order, and to remove all obstructions therefrom; and to execute all lawful orders of the supervisors. Subd. 1 and 3, sec. 1232, R. S. So, whenever any highway became impassable by reason of any casual interruption from the washing away or injury of any part of such highway, it was the duty of the overseer to cause such highway to be put in passable repair as soon as practicable. Sec. 1233, R. S. It was, moreover, made lawful by the statute for any overseer of high-

ways, or any person acting under his direction, to enter upon any lands, adjoining to or *near* the highway in his district, and construct such drains or ditches *as might be necessary* for the improvement or preservation of such highways; but such overseer or other person was thereby required to carefully avoid doing any unnecessary injury upon the same. Sec. 1236, R. S. And so the statute provided that if any owner or occupant of lands so entered upon, or used for any of the purposes mentioned in the preceding section, should feel himself aggrieved, *he might apply to the supervisors* of the town, who were thereby required to appoint three disinterested electors of such town to appraise the damages; and such electors, being first duly sworn justly and impartially to appraise the damages done upon such lands, were thereby required to proceed and estimate the same; and the damages, if any, allowed by them were thereby required to be certified under their hands, and to be audited by the town board, and paid out of the town treasury. Sec. 1237, R. S.

By these sections the legislature have in terms authorized the construction of such drains or ditches as might be necessary for the improvement or preservation of highways, even though it should become necessary in doing so to go upon land in the vicinity, not adjacent to such highway. The distance from the highway of the lands so entered upon, as well as the character of the drains or ditches, is necessarily dependent upon the surface of the country, and the nature of the improvement sought to be made. The land so entered upon is to be as near the place of improvement as practicable. Clearly it was not the purpose of these sections to make the authorities proceed and condemn the land and pay therefor, before entering upon it for the construction of such drains, but rather to make the aggrieved party take the initiative, and apply to the supervisors for the appointment of appraisers to assess the damages. If the case comes within the provisions of these sections, and they are valid,

then there can be no question but what the injunction was properly dissolved.

The constitutional inhibition is that "the property of no person shall be taken for public use without just compensation therefor." Sec. 13, art. I, Const. of Wis. The entry upon the plaintiff's land authorized by the statute, and the construction or opening of the drain in question, was clearly a taking within the meaning of this provision. As the purpose of such taking was the improvement of a public highway, it seems to follow that such taking was for a public use, within the meaning of the provision.

. In Norton v. Peck, 3 Wis., 723, Chief Justice WHITON said: " There can be no doubt that land taken and used for a common highway is taken for a public use. The proposition we deem so clear that no argument is required to prove it." The mere fact that the land taken for the drain in question was outside of the limits of the highway sought to be improved did not prevent its being taken for a public use if such was the result of the taking. The right to obtain materials outside of the limits of the highway to construct or repair the same, upon making compensation, we apprehend would not be questioned on the ground that it was not for a public use. There can be no essential difference in principle from going outside to obtain such materials to be used upon the highway, and going outside to construct drains to draw water from the highway. The distance from the highway to the place where the lands of the plaintiffs were excavated may raise a doubt as to the necessity of such entry; but, as indicated, the right to so take is, by the statute, made dependent upon the necessity.

The question recurs, however, Is the necessity to be determined by the court or the legislature, and, if the latter, then may they delegate such right to the town supervisors or overseers of highways?

In Pittsburgh v. Scott, 1 Pa. St., 314, it was observed by

the court "that the right of eminent domain or inherent sovereign power gives the legislature the control of private property for public use. . . . As a general rule it rests in the wisdom of the legislature to determine what is a public use, and also the necessity of taking the property of an individual for that purpose. . . . The right of eminent domain, as has been repeatedly held, may be exercised by the government through its immediate officers or agents, or indirectly through the medium of corporate bodies or private individuals." It is there, in effect, conceded, however, that courts may interfere where it clearly appears that the right has been abused by the legislature in authorizing the taking for a private use instead of a public use.

In *Talbot v. Hudson*, 16 Gray, 417, it was held that " the determination of the legislature is not conclusive that a purpose for which it directs private property to be taken is a public use, *but is conclusive*, if the use is public, *that a necessity exists* which requires the property to be taken."

In *Williams v. School District*, 33 Vt., 271, it was held in effect that the taking of land for a school-house was for a public use, and that the quantity of land allowed to be taken was not limited to the mere site of the school-house, but included such adjacent land for the purpose of a yard, etc., as the selectmen or commissioners might think requisite. As to the necessity of such taking, it was there said by POLAND, J., for the court, " that where the use is a public one, it rests wholly with the legislature to say whether sufficient necessity exists to justify granting the power to take private property therefor, and that courts will not interfere with their discretion, at least not unless the entire absence of any necessity is shown." Page 280.

In *Beekman v. S. & S. R. R. Co.*, 3 Paige, 73, Chancellor WALWORTH said: " But if the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether

the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of *eminent domain*, and to authorize an interference with the private rights of individuals for that purpose." This was sanctioned by *Hartwell v. Armstrong, supra*, which was an action by several owners of land to restrain the commissioners from draining the Rome swamp, and the more recent case of *Matter of Ryers*, 72 N. Y., 8, under a similar act.

In *Anderson v. Turbeville*, 6 Coldw., 160, it was held, in effect, that the taking of private property for public use was an act of the political power of the state, and while the courts would determine whether the purpose or use for which it was taken was a public use, yet the necessity or utility of the taking was a question for the legislative department of the government exclusively. The same was held in *C., R. I. & P. R. R. Co. v. Lake*, 71 Ill., 333; *Smith v. C. & W. I. R. Co.*, 15 Chi. Leg. N., 217; *Smith v. Taylor*, 34 Tex., 589; *Jones v. U. S.*, 48 Wis., 408; *Teegarden v. Racine*, 56 Wis., 545.

It already appears from the authorities cited, and we apprehend there can be no question but what the legislature had the right to delegate the exercise of the right of eminent domain to the town supervisors or overseers of highways. *Pratt v. Brown*, 3 Wis., 603; *Anderson v. Turbeville, supra; Backus v. Lebanon*, 11 N. H., 25. But, as indicated, under the constitutional clause in question private property cannot be taken, even for a public use, without just compensation therefor. Was such compensation here made? It is conceded that compensation was not actually paid nor tendered. Sec. 1237, R. S., referred to, provided a method whereby the owner or occupant of the land so entered upon or used, feeling aggrieved, could, on his own application, have such damages appraised and paid by the town. Was this provision for payment just compensation for the land taken, within the

meaning of the constitution? The precise question does not seem ever to have been decided by this court.

In *Norton v. Peck, supra,* the question was whether a road could be laid out and opened through uncultivated and uninclosed lands without consent of the owner, and without making compensation therefor, as the statute at the time only made provision for damages in case of laying out such road through inclosed, improved, or cultivated lands, and it was observed by the court that "if our statutes make no provision for ascertaining and paying the damages which the owners of such property sustain by the taking of it for public uses, it rests with the legislature to supply the defect. Unless some mode exists we do not see how the property can lawfully be taken." Page 723. But here, as we have seen, a method for obtaining compensation did exist, and hence this case is clearly distinguishable from *Norton v. Peck,* where no such mode did exist. But the court in that case went further, and said: "In disposing of this case we do not decide that where a highway is laid out and opened by the authorities of a town, actual payment in money of the damages sustained by those whose land is taken for the highway is necessary before the property is taken. The fact that all the taxable property of a town is liable for the damage sustained, and constitutes a fund to which the owners of the land may resort for compensation as soon as the amount of their damage is ascertained, may supersede the necessity of actual payment. But upon this subject no opinion is given." Page 724. That was substantially repeated in *Shepardson v. M. & B. R. R. Co.,* 6 Wis., 613, and *Powers v. Bears,* 12 Wis., 220. But as the taking in those cases was by railroad companies the question here presented was not involved.

In *Goodman v. Bradley,* 2 Wis., 257, the overseer went upon the lands of the plaintiff, outside of the limits of the highway, and took therefrom saw-logs and square timber, which the

owner of the land had cut and prepared, and used them for the construction of a bridge in the highway. The court there, in effect, held that the statutory right to enter upon land outside of the limits of a highway, and take therefrom material for the use of such highway, did not extend to the taking of such saw-logs and timber, and was limited to unimproved lands under sec. 11, ch. 16, R. S. 1849 (sec. 1236, R. S.). But the right to enter upon adjoining lands, and take the things therein mentioned for the uses of a highway, is there conceded. The construction of that section and the one following (sec. 1237, R. S.) was before the court for consideration in *Quinlan v. Pierce*, 34 Wis., 308, but the facts of the case were such that the court did not feel called upon to construe either of those sections.

It has been frequently held in New York, in effect, that where an individual's land is taken for a public highway, such individual obtains the just compensation to which he is entitled, on being provided with a sure and legal remedy for its collection; and that it is not essential that the amount of such compensation should be actually paid or ascertained before the land is taken or appropriated. *Chapman v. Gates*, 54 N. Y., 143, and cases there cited. The same rule has been sanctioned in other states. *Pittsburgh v. Scott, supra; Anderson v. Turbeville, supra; Mercer v. Mc Williams*, 1 Wright (Ohio), 132; *Shearers v. Commissioners*, 13 Kan., 145; *Jackson v. Winn's Heirs*, 4 Litt. (Ky.), 322.

In *Anderson v. Turbeville* it was said by the court that "the property may be taken, if the legislature so choose, without any notice to the owner of the taking or proceeding by which it is taken. The right to notice of the assessment of the compensation is said to be otherwise. To that notice the owner is considered to be entitled of right. . . . It may be taken before compensation be actually paid to the owner. But, under the constitution of the state, and also of the United States, the compensation must be made. If an

adequate remedy be provided, by which the owner can enforce compensation, that is enough to authorize the property to be taken in the first instance." In *Shearers v. Commissioners*, it was held, in effect, that a failure by the owner to seek compensation in the manner prescribed by the statute, should be deemed an absolute waiver of all claims therefor.

Under the authorities cited, there would seem to be no doubt but what secs. 1236, 1237, R. S., are constitutional, and hence, if the plaintiffs have sustained any damages by reason of the drain in question, their remedy is to be sought in the manner prescribed in those sections. In this respect we think there is a broad distinction between the taking of private property for public use by a town or municipal corporation, and the taking of it by a private corporation, the responsibility of which may be very uncertain. Where the property is taken for public use by a town or municipal corporation which is made liable to the owner for any damage sustained by reason thereof, the taxable property of such town or municipality constitutes a pledge or fund to which such owner may resort for payment in the manner so prescribed by the statute, with absolute safety, and hence we must hold, that the providing of such a method of enforcing payment in such a case, and out of such a pledge or fund, is the making of just compensation for the property taken within the meaning of the constitution.

*By the Court.*— The order of the circuit court is affirmed.