KNOXVILLE ICE & COLD STORAGE Co. *et al. v.* CITY OF KNOX-
VILLE *et al.*

(*Knoxville.* September Term, 1925.)

1. RAILROADS. Charter of Knoxville held not to deprive it of prior
   power to build railroad viaduct at its own cost or contribute to cost
   (Priv. Acts 1923, chapter 412, section 5, subsec. 41).

   Charter of Knoxville, section 5, subsec. 41, empowering it by ordi-
   nance to require railroad, at its cost, and that of any street railroad
   using bridge, to build viaduct over its tracks crossing streets, *held*
   not to deprive it of prior power to build at its own cost, or to con-
   tribute to cost. (*Post, pp.* 560, 562.)

   Acts cited and construed: Acts 1923, ch. 412.
   Constitution cited and construed: Art. 2, sec. 29.

2. MUNICIPAL CORPORATIONS. Construction of viaduct over rail-
   road tracks crossing street is corporate purpose, for which city funds
   can be employed (Charter of Knoxville [Priv. Acts 1923, chapter
   412] section 9).

   Construction of viaduct carrying street over railroad tracks is a cor-
   porate purpose, so contract of city to build, railroad to reimburse it
   half the cost, does not violate Charter of Knoxsville, section 9, pro-
   hibiting council from employing the revenue other than for pur-
   poses strictly municipal and local. (*Post, pp.* 562-565.)

3. MUNICIPAL CORPORATIONS. City's contract to construct viaduct,
   railroad to reimburse it for half of cost, is not lending of credit to
   company, requiring election (Constitution, article 2, section 29).

   Knoxville having power to construct viaduct over railroad tracks at
   its own expense, and such construction being a corporate purpose,
   its contract with railroad to build viaduct, railroad to reimburse it
   for half of cost, is not lending of credit of city to company, pro-
   hibited by Constitution, article 2, section 29, except on election and
   assent of three-fourths of votes thereat. (*Post, pp.* 562-565.)

Cases cited and approved: Burnett v. Maloney, 97 Tenn., 697; Colburn v. Railroad, 94 Tenn., 43, Berry v. Shelby Co., 139 Tenn., 532.

4. **MUNICIPAL CORPORATIONS.** On referendum on ordinance for issuance of bonds, only maximum amount and purpose, and not contract, is required to be submitted (Charter of Knoxville [Prin. Acts 1923, chapter 412| section 47).

Under Charter of Knoxville, section 47, declaring that in case of ordinance providing for issuance of bonds it shall not be necessary, on referendum, to submit any other question than the maximum amount and the purpose of bonds, contract between city and railroad relative to building viaduct, for which ordinance provides for issuance of bonds, is not required to be submitted, so that even were it submitted the council could thereafter have modified it before its final execution. (*Post, pp.* 565-568.)

5. **MUNICIPAL CORPORATIONS.** Ordinance for construction of viaduct and issuance of bonds therefor, held by its recitals not to have submitted to referendum, contract relative to viaduct (Knoxville Charter [Private Acts 1923, chapter 412] section 47).

Ordinance for construction of viaduct and issuance of bonds therefor by mere recitals by way of introduction *held* not to have submitted on referendum the contract between city and railroad relative to building it, but only the matters required by Charter of Knoxville, section 47. (*Post, pp.* 565-568.)

6. **RAILROADS.** Knoxville charter held not violated by contract of city and railroad that contract for building viaduct shall be made with person parties may select.

Contract between city of Knoxville and railroad, that viaduct should be built and cost divided between them, *held* not violative of city's charter because of provision that city shall contract with such person as the parties may select, this not requiring the city to employ a contractor that it would otherwise reject. (*Post, pp.* 565-568.)

7. **RAILROADS.** Charter of Knoxville [Priv. Acts 1923, chapter 412| section 61, as to public improvement, held, in view of section 5, subsec. 41, inapplicable to construction of viaduct by railroad under contract with city.

Charter of Knoxville, section 61, as to how, "except as provided otherwise in this act," public improvements may be made, *held*, in view of section 5, subsec. 41, to have no application to viaduct construction by railroad under contract between it and city. (*Post*, pp. 565-568.)

8. **MUNICIPAL CORPORATIONS.** Council can, for valuable consideration, contract with railroad for closing end of street for public purpose (Charter of Knoxville [Priv. Acts 1923, chapter 412] section 5, subsec. 10).

In view of Charter of Knoxville, section 5, subsec. 10, empowering council by ordinance to abolish streets, *held* council can, for valuable consideration, contract with railroad for closing end of street for public purpose. (*Post*, pp. 568-570.)

9. **MUNICIPAL OPERATIONS.**

It does not affect power of city council in its discretion to close end of street that railroad will benefit thereby. (*Post*, pp. 570-576.)

Cases cited and approved: Anderson v. Turbeville, 46 Tenn., 150; Moffitt v. Brainard, 92 Iowa, 122; Henderson v. City of Lexington, 132 Ky., 390; Bragg v. Weaver, 251 U. S., 57; Georgia v. Chattanooga, 264 U. S., 472; Enders v. Friday, 78 Neb. 510; Schwede v. Hemrich Bros. Brewing Co., 29 Wash., 21; Kean v. Elizabeth, 54 N. J., L., 462; Matter of the Mayor, 28 App. Div., 143; Marshalltown v. Forney, 61 Iowa, 578; Pepper v. Railroad, 113 Tenn., 53; Stewart v. Illinois Central Railroad Co., 143 Tenn., 146.

Cases cited and distinguished: State v. Taylor, 107 Tenn., 467; Pope v. Dykes, 116 Tenn., 242.

10. **EMINENT DOMAIN.** City, in absence of statute to contrary, need not, before closing end of street, make provision for damages for impairment of easement therein.

In absence of statute to the contrary, a city, before closing end of street, need not make provision for damages for impairment of easement therein, not being subject to the general eminent domain statute, the property owner having adequate remedy at law for his damages. (*Post*, pp. 576-578.)

Knoxville I. & C. S. Co. v. City of Knoxville.

Cases cited and approved: Simms v. Memphis, Clarksville & Louisville Railroad Co., 59 Tenn., 621; State Highway Department v. Mitchell's Heirs, 142 Tenn., 58; Ill. Cent. R. R. Co. v. Moriarity, 135 Tenn., 446; Anderson v. Turbeville, 46 Tenn., 158; Railroad v. Bingham, 87 Tenn., 535; Smith v. Railroad, 87 Tenn., 630; Hamilton v. Rape, 101 Tenn., 224; Coyne v. Memphis, 168 Tenn., 651.

Case cited and distinguished: Smeaton v. Martin, 57 Wis., 364.

11. **MUNICIPAL CORPORATIONS.**

Charter of Knoxville (Priv. Acts 1923, chapter 412) section 28, inhibiting contract involving expenditure till money therefor is in treasury, has no application to executory contract with railroad for construction of viaduct, contingent on city raising fund. (*Post pp.* 578, 579.)

12. **MUNICIPAL CORPORTIONS.** That for payment of bonds issued on referendum vote, taxes over and above all others limited by law will be necessary held no objection to issuance (Charter of Knoxville [Priv. Acts 1923, chapter 412] section 47).

Under Charter of Knoxville, section 47, for payment of bonds issued on referendum vote, taxes over and above all others limited by law must if necessary be levied, so such necessity is no objection to their issuance. (*Post, p.* 579.)

13. **RAILROADS.** City held to have power to contract with railroad for each paying half of cost of viaduct (Charter of Knoxville [Priv. Acts 1923, chapter 412] Section 5, subsections 4, 10).

In view of Charter of Knoxville, section 5, subsections 4, 10, as to power of council to make appropriation for and establish street and bridges and to issue bonds for public purposes, *held*, city could contract with railroad for each paying half of cost of viaduct. (*Post, pp.* 579-582.)

ON PETITION TO REHEAR.

14. **MUNICIPAL CORPORATIONS.** It cannot in injunction suit against city be presumed it will not close street by ordinance, as it has contract to do.

It cannot, in suit to enjoin city from closing end of street by construction of viaduct till ordinance closing it has been passed, be presumed that city will not close it by ordinance, as in contract for the viaduct it has stipulated that it will do. (*Post. pp.* 582, 583.)

Acts cited and construed: Acts 1923, ch. 412.

15. **EMINENT DOMAIN.**

Shannon's Annotated Code, sections 1981, 1982, as to necessity of condemnation and payment of damages before extension of street is opened, held not applicable to closing of street. (*Post, pp.* 584, 585.)

Case cited and approved: Woolard v. Nashville, 108 Tenn., 353.

Code cited and construed. Secs. 1981, 1982 (S.).

---

FROM KNOX.

---

Appeal from the Chancery Court of Knox County.— Hon. Chas. Hays Brown, Chancellor.

Ralph Cate and Smith & Carlock, for Knoxville Ice & Cold Storage Co. and others.

W. H. Peters, Jr., Fowler & Fowler and Frank Montgomery, for the City of Knoxville and others.

Mr. Justice Hall delivered the opinion of the Court.

The original, amended, and supplemental bills in this cause were filed by complainants, Knoxville Ice & Cold Storage Company (a corporation) and John Shea, against the city of Knoxville (a municipal corporation) and its city council, to enjoin them from passing an alleged illegal and *ultra vires* ordinance closing the east end of McGhee street in said city, and to particularly enjoin said defend-

Knoxville I. & C. S. Co. v. City of Knoxville.

ants from entering into any contract or agreement with the Southern Railway Company to close said street.

Complainants sue in a twofold relationship: First, as parties who, the bill alleges, will be specially damaged by the closing of the east end of McGhee street; and, second, as citizens and taxpayers of the city who will be injured by the alleged unlawful expenditure of money in the construction of a viaduct over Broadway (another street in the city of Knoxville), which crosses the tracks of the Southern Railway Company, by the building of which it is proposed to close the east end of McGhee street.

On the —— day of ——, 1925, the following contract was entered into by and between the city of Knoxville, of the first part, and the Southern Railway Company, a corporation organized and existing under the laws of the State of Virginia, and qualified to carry on the business of a common carrier in the State of Tennessee, party of the second part:

"Whereas, the city of Knoxville, in the years 1919 and 1920, caused to be constructed a viaduct along Gay street in the city of Knoxville, and extending from Depot street across the tracks of the railway company southwardly to the north line of Vine avenue, with ramps on the east and west side of the viaduct leading to Jackson avenue, all of which construction was completed and the bridge accepted by the city on June 2, 1920; and

"Whereas, in 1921, the city of Knoxville brought suit against the Southern Railway Company et al. in the United States District Court at Knoxville, Tenn., for the entire cost of construction of the said Gay street viaduct spanning the tracks of the railway company at the

point where the tracks are crossed by Gay street, in the city of Knoxville, Tenn.; and

"Whereas, the United States District Court for the Northern Division of the Eastern District of Tennessee, in the case of *City of Knoxville* v. *Southern Railway Company et al.* (No. 1819), rendered judgment on January 10, 1924, for the principal sum of $182,359.47, with interest at the rate of six per cent. per annum from June 2, 1920, from which judgment both parties appealed to the United States circuit court of appeals, sixth circuit, where said cause is now pending; and

"Whereas, the city of Knoxville desires the construction of a viaduct over the tracks of the railway company and along Broadway, from Jackson avenue on the south to Depot street on the north, and will by ordinance to be duly and legally passed, undertake the construction thereof at an estimated cost of $250,000, in which cost the railway company should and is willing to share:

"Now, therefore, in order to settle and adjust the said suit and the differences between the parties as to the proportion which each should bear of the cost of the Broadway viaduct and to agree on the obligations of the parties in all the said premises, the parties do covenant and agree as follows:

"The railway company, in consideration of the covenants of the city, agrees:

"1. That it will, in the manner and at the times hereinafter indicated, pay to the city of Knoxville, Tenn.:

"(a) The principal sum of $182,359.47, for which judgment was rendered in said Gay street case, less the cost of installation of lighting system on the viaduct,

which amounts to the sum of $3,611.64, making the amount the railway company is to pay on this account $178,747.83.

"(b)   Interest on $178.747.83 from date of completion of viaduct, June 2, 1920, to February 1, 1925, at six per cent. amounting to $49,989.74.

"(c)   One-half of the cost to the city of construction by the city of the said Broadway viaduct, estimated to cost a total of $250,000, Southern Railway's proportion estimated $125,000.

"Southern Railway's proportion of total cost of construction of viaduct at Gay street, with interest to February 1, 1925, and viaduct at Broadway (Broadway estimated) $353,737.57.

"2.   That it will pay the above set forth total sum of $353,737.57 (subject to correction when the actual cost of Broadway viaduct is ascertained), with interest thereon, at the rate arrived at as hereinafter set forth, in twenty-five (25) annual installments.

"The first installment on account of the adjustment of the Gay street viaduct judgment will be due February 1, 1926, and will be made up of one twenty-fifth of the principal and interest on the principal for one (1) year at the average rate of interest arrived at as hereinafter set forth; and thereafter, on the 1st day of February of each succeeding year, until the twenty-four (24) remaining annual payments have been made, the railway will pay a like sum of the principal and interest for one (1) year at the average rate on the principal sum remaining due on the 1st of February preceding.

"The first installment on account of the Broadway adjustment is to be due one year from the date of completion and acceptance of the viaduct by the city, and will

be for one twenty-fifth of one-half of the cost of construc- tion of the viaduct and appurtenances, interest during construction being included therein, with interest at the average rate per annum ascertained as hereinbelow set forth on said one-half of the total cost from the date of completion and acceptance to the day of payment, and thereafter it will make similar annual payments for the remaining twenty-four (24) years until the sum agreed to be paid by the company is fully paid, the amount of principal upon which the interest is to be calculated being reduced year by year as payments of principal are made until all payments on account of principal are made.

"The interest to be paid on the above set forth total of $353,737.57 (which total is subject to correction when the actual cost of Broadway viaduct is arrived at) is to be ascertained in the following manner:

"The principal sum paid on account of the Gay street viaduct, with interest to February 1, 1925, as set forth above, is to be calculated at six per cent. (6%). The in- terest on the ascertained proportion of the cost of the Broadway viaduct is to be calculated at the rate of in- terest which the city has to pay for the money it secures with which to construct the Broadway viaduct. The total of the principal, to-wit, $353,737.57, is to be divided into the total of the interest charges thus arrived at, and the average rate of interest thereby secured is to be the rate of interest to be paid on the total principal sum for the said twenty-five (25) years.

"4. That it will pay upon the execution of this agree- ment one-half of the costs incurred in the Gay street case, cause No. 4209 in the circuit court of appeals, and the entire costs in the district court.

"The city of Knoxville, in consideration of the covenants of the railway company, agrees on its part:

"1. To accept payment by the Southern Railway Company in the manner hereinabove stated in settlement of the said judgment in the Gay street case, being No. 1819 in the district court of the United States for the Northern Division of the Eastern District of Tennessee, and to dismiss its appeal therefrom and have the said judgment marked satisfied by execution of this agreement.

"2. To pass all proper and necessary ordinances for closing Broadway (or Broad street, as shown on the blue print) as a street at grade from approximately the north line of Jackson avenue northwardly to approximately the south line of Depot street, and for the construction by the railway company, as agent for the city in so doing, of a viaduct along Broadway from, to-wit, the north line of Jackson avenue, to-wit, the south line of. Depot street, together with the necessary track changes, and generally in accord with the general plan hereto attached and made a part hereof, the work on the viaduct to begin within sixty (60) days from the date of the final passage and approval of the necessary ordinances.

"3. The city agrees to provide the money to pay the total cost of the said Broadway viaduct and to accept from the railway company, in full and final release of all obligation of the railway company to construct or contribute toward the construction of the said Broadway viaduct, the payment by the railway company of one-half of the total cost of the said Broadway viaduct, with interest at said average rate per annum, the railway's one-half to be paid at the times and in the manner here-

153 Tenn.—35.

tofore stated. There shall be no obligation on the part of the railway to begin the construction until the city has made provision for the funds with which to meet the payments for the construction, as the same may become due during construction on estimates or partial completion reports, duly approved by the representative of the city and the representative of the railway company.

"4. To pass all necessary ordinances to close and forever abandon McGhee street, from that point on the west where McGhee street enters the property of the railway company; thence eastwardly across the tracks of the railway company to the west line of Broadway.

"5. The city has the option to direct the building of a viaduct of such carrying capacity as to carry the load of a street railway car or cars, but if the city does determine upon such construction, then the difference in cost between the viaduct of strength sufficient to carry the street car tracks and cars and the cost of a viaduct not so strengthened shall not be included in the total of which the railway company is to pay one-half, but that part of the cost of the viaduct is to be borne by the city, so that if and when the street cars are operated thereover, all compensation for the use of the viaduct may inure to the benefit of the city, and no reduction in payment by the railway company shall accrue therefrom.

"The city agrees to pay one-half of the cost of the Gay street case incurred in the United States circuit court of appeals.

"It is mutually agreed that on failure of the railway company to meet any of its payments herein agreed to be made, the remainder of said payments will then come due, and the city may sue on this instrument and have

Knoxville I. & C. S. Co. v. City of Knoxville.

judgment for the sum remaining due in the United States district court at Knoxville, Tenn.

"It is further mutually agreed that the maintenance of Gay street viaduct and Broadway viaduct is to be divided between the parties on the following basis: The city is to maintain the roadway of each viaduct, exclusive of such proportion of maintenance of roadway as may be borne by any third party. The remainder of the maintenance charge of said viaducts shall be divided fifty-fifty.

"It is further mutually agreed that a detailed contract for the construction of the Broadway viaduct and the method of payment therefor, etc., etc., will be entered into between the parties.

"It is further mutually agreed that on completion of the Broadway viaduct a supplemental and final agreement shall be entered into, showing the date of acceptance thereof, the exact cost thereof, the rate of interest the city has to pay for the money with which to construct the viaduct, and a definite ascertainment had of the total principal and interest to be paid annually for the full period of twenty-five (25) years.

"In witness whereof, the parties hereto have hereunto affixed their signatures and seals on the day and year first above written.

"CITY OF KNOXVILLE,

By —— —— ——.

"SOUTHERN RAILWAY COMPANY,

By —— —— ——.

"Attest: —— —— —— ——.

"Attest: —— —— ——, Assistant Secretary."

Pursuant to this contract the defendant city of Knoxville, through its city council, passed the following ordinance:

"An ordinance authorizing not exceeding two hundred and fifty thousand dollars ($250,000) viaduct bonds, subject to vote of qualified electors.

"Whereas, litigation of uncertain outcome is pending in an action brought by the city of Knoxville, in 1921, against the Southern Railway Company, to require said company to pay the entire cost of constructing the Gay street viaduct, which was completed and accepted by the city on June 2, 1920, in which action the United States district court for the Northern Division of the Eastern District of Tennessee rendered judgment on January 10, 1924, in favor of the city for a portion only of such cost, that is, for the sum of $182,359.47 and interest, from which judgment both parties have appealed to the United States circuit court of appeals, sixth circuit, where said cause is now pending; and

"Whereas, in another action brought by the city of Knoxville against the Southern Railway Company in the circuit court (chancery court) for Knox county, to require said company by mandatory injunction to construct and perpetually maintain a viaduct over the tracks of said company along Broadway, a decree was entered in favor of the Southern Railway Company and against the city of Knoxville, and upon appeal to the supreme court of Tennessee said decree was affirmed on January 17, 1924; and

"Whereas, it is necessary immediately to construct a viaduct over the tracks of said company along Broadway from Jackson avenue to Depot street at an estimated cost

of two hundred and fifty thousand dollars ($250,000), and a controversy has arisen between the city and the Southern Railway Company as to the proportion of cost of said Broadway viaduct, if any, which said company should bear; and

"Whereas, in order to settle and adjust the first-mentioned litigation and the said controversy, an agreement has been entered into between said company and the city by which the first-mentioned litigation shall be settled for the sum of $178,747.83, and interest, and by which said company will pay one-half the cost of said Broadway viaduct, which one-half of cost and the sum so to be paid for the settlement of the Gay street viaduct litigation is to be paid in equal annual installments over a period of twenty-five years; and

"Whereas, it is deemed by the council to be to the best interest of the city and its inhabitants that said litigation and controversy be settled as provided in said agreement, and that said Broadway viaduct be constructed by the city, one-half the cost to be borne by said company as contemplated by said settlement agreement:

"Now, therefore, be it ordained by the council of the city of Knoxville:

"Section 1. That if this ordinance shall be ratified by a majority of the qualified voters of the city of Knoxville at an election to be called and held, the council of the city of Knoxville shall thereupon be authorized to issue not exceeding two hundred and fifty thousand dollars ($250,000) bonds of said city for the construction of a viaduct over the tracks of the Southern Railway Company along Broadway from Jackson avenue to Depot street.

"Section 2. This ordinance shall take effect 17 days from and after its passage, the welfare of the city requiring it."

Thereafter, to-wit, May 12, 1925, there was passed by the city council of said city a resolution, No. 42, calling a special election to be held on June 20, 1925, for the purpose of submitting to the qualified voters of the city the question of the ratification of this ordinance. The election was held in accordance with this resolution, at which there were cast 4,107 votes, of which 2,638 votes were in favor of the bonds provided for in said ordinance, and 1,469 votes were against the bonds.

On July 3, 1925, certain slight modifications were made in the contract entered into by the city and the railway company as follows:

(1) In the contract as originally executed the city agreed to pass all proper and necessary ordinances "for the construction by the railway company as agent for the city in so doing of a viaduct along Broadway," while, as modified, ordinances are to be passed requiring the city "to construct" the viaduct; that is, the city is to construct it instead of its being constructed by the railway company as the city's agent.

(2) In the contract as originally executed it was provided that "there shall be no obligation on the part of the railway to begin the construction until the city has made provision for the funds with which to meet the payments of the construction," while the contract, as modified, reads: "The city shall be under no obligation to begin the construction until provision has been made by it for the funds," etc.

(3)   In the contract as originally executed it was provided: "That a detailed contract for the construction of the Broadway viaduct and the method of payment therefor, etc., etc., will be entered into between the parties."

(4)   In the contract, as modified, it is provided that the detailed contract described shall be entered into between the "city and such contractors as the parties hereto may select. The railway company may contract with the city to do such part of the work as to the parties may seem best."

On July 21, 1925, and after the proposed bond issue had been ratified by the voters of the city at the election held, a resolution was passed by the city council providing for the issuance and sale of the $250,000 of bonds voted. This resolution contains the following provision:

"That in each year while any of said bonds shall be outstanding, a direct annual tax shall be levied upon all taxable property within the city over and above all other taxes authorized or limited by law sufficient in amount to pay the principal and interest of the bonds herein authorized, falling due in the following year; provided that the amount of such annual levy shall be reduced in any year from the amount of money received from the Southern Railway upon its contract to pay a portion of the cost of said viaduct, or from other sources if the money so received shall have been placed in the special fund applicable only to the payment of such principal and interest."

No ordinance has yet been passed by the city making any provision for the levying of an annual tax for the purpose of paying the principal and interest of the pro-

posed bonds other than the above resolution, and it is al
leged by complainants that no such ordinance can be
lawfully passed because the obligations of the city large-
ly exceed any amount of revenue that may be obtained
by the appropriation thereof, and no funds are or will
become available by means of appropriation for the pur-
pose of paying the principal and interest of the bonds
to be issued.

It is also alleged that the city of Knoxville is without
power to build and construct the viaduct in question un-
der the method proposed and otherwise than is prescribed
by the city's charter (chapter 412, Private Acts of 1923).

The plan proposed for the construction of the viaduct
is also attacked upon the ground that, under the ordinance
passed and the contract entered into, the city is to lend
to the railway company one-half of the proceeds of the
bonds to be issued and of the amount of the cost of the
construction of the viaduct.

It is alleged that this is in violation of the provisions
of the charter of the city, and also violates article 2, sec-
tion 29, of the Constitution of the State, which prohibits
the lending of the credit of any city or town to or in aid
of any person, company, association, or corporation, ex-
cept upon an election to be first held by the qualified
voters of such city or town, and the assent of three-
fourths of the voters cast at said election.

It is also alleged that the ordinance providing for the
issuance of bonds and the construction of the Broadway
viaduct is illegal and void for the reason that it provides
for the erection and construction of said viaduct by the
railway company, as the agent of the city, under the con-
tract as first executed and entered into prior to the sub-

mission of the question of the issuance of bonds to the people, and under the agreement, as modified after the election, under contracts to be entered into by the city with such contractor or contractors as the city and the railway company may select.

It is alleged that it is in violation of the provisions of the charter, the construction and improvement of viaducts and bridges being placed by the charter under the control of the director of public service; and the charter further provides that such public improvement must be made by the director of public service, either by direct employment of necessary labor and the purchase of necessary supplies and material, or by contract duly let after competitive bidding either for gross price or upon unit basis for the improvements.

It is also alleged that the contract with the Southern Railway Company and the ordinance passed in pursuance thereof undertakes to obligate the city to pass ordinances and proceedings for the closing, not only of Broadway itself as a street at grade, but of McGhee street, a public thoroughfare, which intersects Broadway at a point covered by the viaduct, and to a point several hundred feet west of the viaduct, so as to give that space over to the Southern Railway Company. It is alleged that no such ordinance has been passed, and the city council are wholly without power or authority to make a contract for the passage of such an ordinance.

It is also alleged that the city, through its council, is wholly without power or authority to close McGhee street in the method proposed, for the reason that the closing of said street is not for a public but a private purpose; that the closing of this street as it does at a point so far west

of the viaduct as to grant a franchise upon a portion of the street is wholly unnecessary to the construction of the viaduct; that the closing of said street as proposed serves only the private interest of the Southern Railway Company, and no such discretion can be legally exercised, even the legislative department of the city being without power or authority to take and appropriate a public street for the uses and purposes of a private person or corporation.

It is also alleged that the city is without power, under its charter, to take and appropriate the property rights of complainants on McGhee street even for public purposes; that the section of the charter relied upon by the city grants no such power, and makes no provision whatever for the payment of compensation to the owner whose property is to be taken and appropriated; that while general power is given the city to make appropriations to open, alter, widen, abolish, extend, establish, or otherwise improve streets, the general authority cannot apply so as to authorize in connection therewith the taking of property of private persons in said streets, especially where the same has previously been appropriated for the public use.

It is also alleged that the ordinance and the contract with the Southern Railway Company, under which it is proposed to construct the viaduct, has never been submitted to the people for ratification of a majority of the legal voters as required by the charter; that while it is true the ratification of the ordinance was submitted to the people and a majority of the votes cast in favor of the ordinance, nevertheless it was passed upon a particular agreement with the Southern Railway Company,

which differed in many material respects to the agreement under which it is now proposed to construct the viaduct, and which has been entered into since a submission of the ordinance to the vote of the people.

It is also alleged that the issuance and sale of the bonds and the appropriation of the proceeds for the construction of the viaduct in question is illegal, and the ordinance passed for that purpose is absolutely void, because under the charter of the city, bonds for any public municipal purpose can only be issued and sold to take care of the direct general obligations of the city; that the city cannot, in the first place, obligate itself for the payment of any portion of the cost of the viaduct; and, in the second place, one-half of the cost of the viaduct, to which the proceeds of the bond issue are to be applied, is an obligation assumed by the Southern Railway Company in the construction of said viaduct.

It is also alleged that the effect of the construction of the viaduct on Broadway is to abolish, abandon, and close Broadway as a street at grade, and its action can only be accomplished by means of an ordinance and upon its being made to appear that such action is necessary and essential to the public interest; that no such ordinance has been passed, and the agreement with the Southern Railway Company to pass such an ordinance is *ultra vires* illegal and void.

It is further alleged that the agreement with the Southern Railway Company, and the ordinance on which it is based, as well as the purpose of the city to spend its funds in connection with the construction of the viaduct, is illegal and void for the further reason that at the time thereof the money for such contract and expenditure

thereof was not in the treasury to the credit of the fund, nor had the director general of finance certified that fact to the city council or general officer having in charge the expenditure thereof; that the city's charter strictly prohibits making such contract and declares the same to be void.

It is further alleged that under the plans and specifications embraced in the contract with the Southern Railway Company, the Southern Railway Company is given a franchise right to occupy and use McGhee street along and at points not heretofore granted to said railway company.

It is further alleged that the proposed issuance of $250,000 of bonds, and the expenditure of the proceeds thereof in the construction of the viaduct, is illegal and void for the further reason that the city has exhausted its tax-levying power in the appropriation of public revenue for other purposes, and the ordinance attempting to levy the tax for the purpose is on that account illegal and void.

Defendant answered the original, amended, and supplemental bills, denying the invalidity of the contract and ordinance, and much proof was taken. Upon final hearing the chancellor dismissed the bill, and from this decree complainants have appealed to this court and assigned errors.

The evidence is overwhelming that the construction of the viaduct over Broadway at the point proposed is a public necessity; in fact, we do not understand that this is disputed by complainants. The length of the viaduct which is now proposed to be constructed is 839.8 feet, and its construction, at the point proposed, necessarily

results in closing the east end of McGhee street, upon which the property of the complainant Knoxville Ice & Cold Storage Company abuts. If its north end were carried to Park street, it would pass approximately seven feet over the present grade of Depot street, which would necessitate the construction of approaches from that street, and large damages would be inflicted on property owners on both Depot street and Broadway between Depot and Park streets, which the witness Harris, who is a practical civil engineer, and is now director of public service of the city of Knoxville, estimates would amount to $125,000. Both sides of Broadway between Depot and Park streets are occupied by buildings. On the east side are two-story brick buildings, and one building in which the office of the Cumberland Telephone & Telegraph Company is situated. This building is four stories in height, and some of the buildings on the west side are residences and others are stores.

The property of complainant Knoxville Ice & Cold Storage Company fronts one hundred six feet on McGhee street and extends northward along Chamberlain street two hundred fifty feet. The main entrance to this property is on Chamberlain street. It also has another entrance on McGhee street. No part of the property of the Knoxville Ice & Cold Storage Company abuts on that part of McGhee street that is to be closed by the building of the viaduct. The part of the street to be closed, at the nearest point, is a distance of one hundred seventy-four feet from this property. The property of complainant Shea is located on the west side of Chamberlain street, and is not in the same block with the part of McGhee street that is to be closed. If the east end of Mc-

Ghee street is closed the Knoxville Ice & Cold Storage Company will still have a way of egress and ingress to and from its property on Chamberlain street, and also a way of egress and ingress to and from McGhee street west of that portion of McGhee street which is to be closed to Chamberlain street. The closing of the east end of McGhee street will not affect the complainant Shea's means of ingress and egress from and to his property by means of Chamberlain street, and only the means of egress and ingress of both complainants to and from their property along McGhee street is affected from a point about seven hundred feet west of where the proposed viaduct crosses McGhee street east along said street. McGhee street, near its east end, is crossed by fifteen tracks of the railway company, and there is an average of one hundred fifty movements of cars and trains across this street daily.

It is insisted by complainants, through their assignments of error, that the city of Knoxville is without power to construct and build the viaduct in question under the plan proposed, and otherwise than is prescribed by the act of the legislature incorporating said city (chapter 412, Private Acts of 1923).

By subsection (41) of section 5 of said charter said city is vested with the power:

"To require and compel any steam railroad company operating within said city, and crossing with its lines any of the streets of the city, to build and construct and forever maintain all necessary bridges, viaducts, and underpasses over and under the tracks of said steam railroad company wherever said track or tracks cross the public streets, alleys, ways and thoroughfares of said

city, when, in the judgment of the legislative body such
bridge, viaduct or underpass should be built or construct-
ed for the preservation and protection of the public using
such streets, alleys, ways and thoroughfares; and the
entire cost of so constructing such bridge, viaduct or
underpass shall be borne and paid by the person, firm
or corporation holding or maintaining and operating
such steam railroads, with the exception of that portion
of the surface of such bridge or underpass which may
be used by any street railway company; and to the ex-
pense incident to constructing and maintaining the sur-
face and travel way of such bridge, underpass or viaduct,
used and occupied by any street railway company, shall
be borne and paid by such street railway company from
the outer ends of the ties of the track or tracks thereon.
In order to enforce this subsection, the legislative body
of said city shall cause necessary plans and specifications
for the construction of such bridge, viaduct or underpass
to be made and prepared by competent civil engineers,
and upon approval thereof by said legislative body, said
legislative body may, by ordinance, order and require
the building and construction to be begun not more than
sixty days after the passage of such ordinance, and the
work to be completed within such reasonable time as may
be fixed and named in said ordinance.   In case of the
failure of the owner or operator of any such steam rail-
road to comply with such ordinance, it shall be subject
to a fine of $50 for each day that it fails to comply there-
with, this fine to be assessed and collected upon convic-
tion before the city judge of said city.   Said city may
furthermore enforce compliance with said ordinance by
mandatory injunction by a bill filed for that purpose in

the chancery court of Knox county, Tennessee, or in the federal court; or it may proceed to build and construct such bridge, viaduct or underpass at the cost and expense of the owner or operator of the railroad affected thereby, and recover such cost and expense, with interest thereon, by suit instituted for that purpose in any court of competent jurisdiction that may be held in Knox county, Tennessee. Damages for all change of grade incident to the construction of said underpass, viaduct, or bridge, shall be chargeable to and payable by the city of Knoxville.''

1. Complainants insist that under this provision of the charter the city has no authority to contribute any part of the expense of constructing the viaduct, but that the entire cost shall be paid by the railway company.

We do not think this contention is well grounded. The intention of the legislature, by enacting this subsection, was to make clear the power of the city, within its discretion, to require the railway company to bear the entire cost of constructing any bridge, viaduct, or underpass under the circumstances pointed out, and not to restrict the city's power to construct the same at its own expense, or to deny to it the power to contribute to the cost of its construction, if the city council, in their discretion, should deem it proper, just, and equitable for it to do so. The language of said section and subsection, when read and considered together, unquestionably bears this construction. It reads:

"That the city as incorporated under this act shall have power by ordinance: . . . (41) To require and compel any steam railroad company,'' etc.

Before its passage we take it that it would not be questioned that the city had the power itself to construct the viaduct and pay the entire cost thereof. And in the language above quoted there is not the slightest suggestion that such power is abrogated or restricted, and no such construction should be given the provision unless the intention is clearly expressed. In subsection (41), in specifying how the power may be exercised, after requiring the city council to have plans and specifications for the viaduct prepared by competent engineers, it is provided that "said legislative body may, by ordinance, order and require the building and construction to be begun not more than sixty days after the passage of such ordinance;" and, if the company fails to comply with the ordinance, that the "city may furthermore enforce compliance" by mandatory injunction, "or it may proceed to build and construct such bridge, viaduct or underpass," and recover from the company the cost of construction, with interest. The use of the last two "mays" are not significant, because the two clauses specify alternative methods of relief, but it is significant that the city may order and require the railway company to construct the viaduct, and not that it shall require it to do so. The word "may" in legislation is sometimes construed to mean "shall," but it must appear from the context of the act that such was the intention.

Complainants especially rely upon the language, "and the entire cost of so constructing such bridge, viaduct or underpass shall be borne and paid" by the railway company.

We think the meaning of this language is apparent, and these words introduce a clause which defines the rel-

153 Tenn.—36.

ative obligations of the railway company and "any street railway company" that may use the bridge or viaduct. We think that clause and the succeeding one were inserted for the benefit of the railway company by relieving it from the cost of constructing the surface and travelway of such street car line "from the outer ends of the ties of the track or tracks thereon." In other words, the two clauses specify what the relative liabilities between the railway company and the street car company are when the city determines that the railway company shall pay for the construction of the viaduct.

No case has been cited, and we are not aware of any, wherein it has been held that a municipality has no choice in the matter of building a viaduct and can make no contribution to or pay the entire cost of the viaduct if it sees proper to do so, and we think its power and authority to do cannot be questioned when it is a public purpose and in the interest of the public.

2. It is next urged that the contract between the city and the railway company violates the provisions of the charter of the city, and articles 2, section 29, of the Constitution of the State, the substance of which has hereinbefore been set out.

Section 9 of the charter prohibits the city council from making any appropriation or subscription for any stock in any corporation except under the general laws of the State, and "from employing or appropriating the revenue or taxes in any other manner than for purposes strictly municipal and local, and according to the provisions of this act."

Complainants insist that the agreement by the city to advance for the railway company one-half of the cost of

the viaduct, the same to be repaid as provided for in the contract, without the assent of three-fourths of the votes cast at the election held to authorize the issuance of the bonds, falls within these prohibitions of the constitution and the city's charter.

The construction of the Broadway viaduct is a corporate purpose. *Burnett* v. *Maloney,* 97 Tenn., 697, 37 S. W., 689, 34 L. R. A., 541. If the city has authority to pay the entire cost of the viaduct, or such part as it may regard as just and equitable, it has the power to contract with the railway company to advance the whole of the cost, the railway company to reimburse the city for one-half. The lesser power is embraced in the greater.

The holding of this court in *Colburn* v. *Railroad,* 94 Tenn., 43, 28 S. W., 298, and *Berry* v. *Shelby County,* 139 Tenn., 532, 201 S. W., 748, is relied on by complainants to support their contention. There is a marked difference in the facts of those cases and in the instant cause. In the Colburn case Hamilton county had undertaken, under the provision of a special statute, to issue bonds for the purpose of contributing to the construction of a bridge over the Tennessee river without submitting the question to a vote of the people. Under the contract between the county and the railroad company the bridge was to be constructed by the company, and the county and the company were each to own certain interests in the bridge.

The court said: "It is not simply the case of the railroad company building the bridge, as the agent of the county and for the county, to be paid for by the county after it is built, but they are engaged in a joint enterprise, and the aid of the county is extended to the rail-

road, to enable it to consummate the enterprise, by issuing its bonds as a basis of credit for the enterprise.''

In the cause under consideration the city itself is not only to construct the viaduct, but when constructed it will be the property of the city, and the railway company will have no interest therein or make any use thereof.

The Berry case was an action to enjoin the issuance by Shelby county of $150,000 of bonds under a special act of the legislature in aid of Bolton College, which institution had been established with funds arising out of the will of Wade Bolton and was not owned by the county. The act did not provide for the matter to be submitted to the people.

The court said: ''Where the purpose is direct, and is accomplished by direct action of the county or city, as in building, or employing others to build for it, the county's bridge, or the city's waterworks, to be owned by the county or city, the matter falls under the first paragraph of section 29 of article 2, quoted supra, and the legislature need not require an election.''

The court said further: ''Another point should be noted in respect of *Shelby County* v. *Exposition Co.*, supra [3 Shan. Cas., 508], which is common to all the cases illustrating the effectuation of a county purpose through the direct action of the county authorities, and that is the county handles its own funds, and applies them directly to the matters in hand. Thus in the case just referred to the county appointed its own agents to manage and disburse the fund, and to make effectual the county purpose, the exhibition of its resources. It did not turn the money over to the exposition company. The opposite is true in the case before us. The money, ac-

cording to the scheme outlined in the acts, is to be turned over to Bolton College to be expended in the construction and equipment of certain desired buildings. Moreover, when the work is completed Bolton College will own the buildings, and the county will have nothing to show for its money.''

3. It is urged that the ordinance providing for the issuance of bonds and for the construction of the Broadway viaduct is illegal and void for the further reason that it provides for the erection and construction of said viaduct by the railway company as the agent of the city under the first agreement entered into prior to the submission of the question of the issuance of bonds to the people, and under the agreement entered into after the election under contracts to be entered into by the city with such contractor or contractors as the city and the railway company may select. It is said that this is in violation of the provisions of the charter, because the construction and improvement of viaducts and bridges is by the charter placed under the control of the director of public service, and the charter provides that such public improvements must be made by the director of public service, either by direct employment of the necessary labor and the purchase of necessary supplies and material, or by contract duly let after competitive bidding either for a gross price, or upon a unit basis.

The charter of the city did not require the submission of the contract between it and the railway company to a vote of the people, and therefore, if the contract had been submitted, the council would not have been bound by the vote, and could have modified it before its final exe-

cution. However, in fact, the ordinance did not purport to submit the contract to the voters.

Only as an introduction the ordinance detailed the history of a prior litigation between the railway company and the city, the necessity of constructing the viaduct, the cost of which would be approximately $250,000, and recited that, in order to settle and adjust the first-mentioned litigation and the said controversy, an agreement had been entered into between said company and the city by which the prior litigation should be settled for the sum of $178,747.83 and interest and by which the said company should pay one-half of the cost of the Broadway viaduct, which one-half of the cost and the sum so to be paid in settlement of the Gay street viaduct litigation should be paid in equal annual installments over a period of twenty-five years, and that the council deemed it to the best interest of the city that the controversy between it and the railway company be settled according to the terms of the agreement, and the viaduct constructed and paid for as specified therein; and therefore it was ordained:

"That if this ordinance shall be ratified by a majority of the qualified voters of the city of Knoxville at an election to be called and held, the council of the city of Knoxville shall thereupon be authorized to issue not exceeding two hundred and fifty thousand ($250,000) dollars bonds of said city for the construction of a viaduct over the tracks of the Southern Railway Company along Broadway from Jackson avenue to Depot street."

It will be noted that the only representations made with reference to the contract were that the cost of the viaduct was estimated to be $250,000; that the railway

company had agreed to pay $178,743.83 and interest in settlement of the litigation over the Gay street viaduct, and also one-half the cost of the Broadway viaduct, all to be paid in equal annual installments over a period of twenty-five years. The enacting clause states only the maximum amount of bonds to be issued and the purpose for which the proceeds are to be used. This was in exact accord with section 47 of the charter, which provides:

"That in any election held under the provisions of this charter wherein there is submitted to the qualified voters the question of the ratification of any ordinance of said city under the provisions of this charter to determine whether or not said city shall issue bonds, it shall not be necessary, in case of ordinances providing for the issu ance of any bonds, to submit to the voters any other question than the maximum amount and the purpose or purposes of the bonds proposed to be issued under said ordinance."

There was therefore no material variance between the ordinance submitted and the contract finally entered into between the city and the Southern Railway Company.

The contract between the city and the railway company merely provides that the city shall build the viaduct, but enters into no details as to how it is to be constructed. It can pursue any method it may deem proper and has power to adopt, and it will not be presumed that it will adopt an unlawful method for its construction. The only restriction as to the contract for construction is that a detailed contract for the construction of the viaduct shall be entered into between the city and such contractor or contractors as the parties may select. The rail-

way company may contract with the city to do such part of the work as to the parties may seem best.

This last provision creates no obligation, and if it did it would not fall within the above-quoted provisions of the charter, as it manifestly contemplates that the railway company may do the work, while the city would pay for the material and labor.

Nor do we think the contract violative of the city's charter because the railway company is allowed to participate in the selection of a contractor. The necessity of an agreement between the parties upon the employment of a contractor does not require the city to employ a contractor it would otherwise reject. A contractor must be employed who is acceptable to the city.

There is another conclusive reason why this requirement does not violate the charter.

Section 61 has no application to a viaduct constructed by a railway company under a contract between the city and such company. That section is introduced by the phrase, ''except as provided otherwise by this act.''

Under section 5, subsec. (41), when the viaduct is constructed by the railway company, the only connection the city has with it is to furnish the plans and specifications. If the city is not compelled to require the railway company to pay the entire cost of construction, then, by necessary implication, it has the power to contract with the company as to the amount to be contributed by each in the plan for its construction.

4.   We are of the opinion that the city council is vested with power and authority to contract with the railway company to close the east end of McGhee street.

Subsections (1) to (52), of section 5 of the charter, enumerates the powers of the legislative body of the city. It is provided that these powers shall be exercised by "ordinance." Many of these functions fall within what is known as the police power, as, for illustration, those named in subsection (13):

"To regulate or prohibit and suppress theatrical or other exhibitions, moving picture shows, amusements, gambling houses, disorderly houses," etc.

These matters are wholly within the domain of legislation, and the city council cannot bind itself, or its successor, as to what shall be done with reference to them.

Other provisions relate to subjects about which the city may enter into valid contracts. For instance, subsection (9), "To provide the city with water; to provide for the regulation, construction, and maintenance of waterworks," etc., and subsection (25), "To establish, erect and organize a workhouse or farm colony within or without the city." To this latter class belongs subsection (10), which relates to the opening, altering, abolishing, widening, extending, establishing, grading, paving, or otherwise improving, cleaning, and keeping in repair the streets, alleys, and sidewalks. The city can certainly make a valid contract for the improvement of a street or the laying of a sidewalk. With equal certainty for a valuable consideration the city council could contract for the opening of a street when a street would be for a public purpose. For a like reason a contract for the abolishment of a street or a part thereof is valid when the contract is supported by valuable consideration and its abolishment is for a public purpose.

The proof shows that, at the point of junction of Broadway and McGhee streets, the viaduct will be approximately twenty feet above the street; that it would be impossible to construct an approach from McGhee street to the viaduct without constructing it with a clearance of eighteen feet over the entire network of the tracks of the railway company, and extending it to Chamberlain street, which would require the construction of a ramp, or additional viaduct practically the same length and at the same cost as the Broadway viaduct.

5. It is urged that the city is without power under its charter to take and appropriate the property rights of complainants on McGhee street, even for public purposes; that the section of the charter relied on by the city grants no such power, and makes no provision whatever for the payment of compensation to the owner whose property is to be taken and appropriated. It is said that, while general power is given the city to make appropriations to open, alter, widen, abolish, extend, establish, or otherwise improve streets, that general power cannot apply so as to authorize in connection therewith the taking of property of private persons in said streets, especially where the same has previously been appropriated for the public use, and that provision of the charter making provision for compensation to be paid to persons having property rights therein.

In *State v. Taylor,* 107 Tenn., 467, 64 S. W., 769, it was said:

"Authorities are abundant for the proposition that a municipal corporation, being the State's representative, may ordinarily vacate, discontinue, or abandon its easement in a street or part thereof, whenever by its proper

board found to be unnecessary for public use. Dillon Mun. Corp. (4th Ed.), section 666; Elliott Rds. & Sts. (2d Ed.), section 871; Lewis Emi. Dom., section 134; Randolph Emi. Dom., 409; *Anderson* v. *Turbeville,* 6 Cold., 150, 157; [*Moffitt* v. *Brainard,* 92 Iowa, 122, 60 N. W., 226.] 26 L. R. A., 828, note.''

In *Pope* v. *Dykes,* 116 Tenn., 242, 93 S. W., 88, it was said:

''Mr. High, in his work on Injunctions (volume 2, art. 1025), says:

'' 'In discussing injunctions against public officers, it is important to observe that courts of equity do not interfere by injunction for the purpose of controlling the action of public officers constituting *quasi*-judicial tribunals, such as a board of supervisors, commissioners of highway, and the like, on matters properly pertaining to other jurisdictions, nor will they review or correct errors in the proceedings of such officers.

'' 'So where commissioners of roads and highways are by law intrusted with full jurisdiction of matters pertaining to change in roads, a court of equity will not interfere with the exercise of their discretion, unless a strong case of fraud or irreparable injury is shown. And where they have exercised their discretion and made their decision in good faith, and without any intention of injuring private persons, an injunction will not be allowed against their action, when they are acting within the scope of their authority and discretion, however impolitic and impressional may be the law under which they are acting.'

''Mr. High further says, in article 1270: 'A court of equity will not interfere by injunction with the action of

a board of commissioners appointed to establish and repair streets and make municipal improvements, when municipal authorities are acting within recognized powers or exercising the discretionary power. But a court of equity has not jurisdiction to interfere unless the power or discretion is being manifestly abused to the oppression of others.' "

In 13 R. C. L., section 62, pp. 69, 70, it is said:

"The question of the necessity of closing a street or highway, as distinguished from the question of public purpose or use, belongs exclusively to the legislative department of the government. So where the power exists in a municipality, it is for the municipal authorities to determine when it shall be exercised, and their action in this regard will not be reviewed by the courts in the absence of fraud, or a manifest abuse of discretion. The court cannot control or revise such decision on the ground of inexpediency, injustice, or impropriety. . . . The presumption is that a street or highway was vacated in the interest of the public and that its vacation was necessary for public purposes, and the burden of showing to the contrary will be put upon the persons who object to the proceeding."

To the same effect is *Henderson* v. *City of Lexington,* 132 Ky., 390, 111 S. W., 318, 22 L. R. A. (N. S.), 20; *Bragg* v. *Weaver,* 251 U. S., 57, 40 S. Ct., 62, 64 L. Ed., 135; *Georgia* v. *Chattanooga,* 264 U. S., 472, 44 S. Ct. 369, 68 L. Ed., 796.

The fact that the Southern Railway Company will be benefited by closing the east end of McGhee street does not affect the power of the city council to exercise its discretion in this regard. *Henderson* v. *City of Lexington,*

132 Ky., 390, 111 S. W., 318, 22 L. R. A. (N. S.), 20;
*Enders* v. *Friday,* 78 Neb., 510, 111 N. W., 140, 15 Ann.
Cas., 685; *Freeman* v. *Centralia,* 67 Wash., 147, 120 P.,
886, Ann. Cas., 1913D, 786.

In the case last cited the court said:

"It is most seriously contended that an injunction
should issue because, by their demurrer, the defendants
admit that they are 'conspiring and confederating' to-
gether with intent to turn over the streets when vacated
to a private use. It is a rule, sustained by universal au-
thority, that courts will not inquire into the motives of
a legislative body having power to act upon a given
subject-matter. But granting that we had the right to
do so, it does not follow that, because the property is to
be put to purposes most convenient to the one acquir-
ing title thereto, an injunction will issue. In the first
place, having power to vacate, if the title in the street
reverts to the abutting owner (*Schwede* v. *Hemrich Bros.
Brewing Co.,* 29 Wash., 21, 69 P., 362), this court could
not control or interfere with a lawful use of the prop-
erty. Or, granting that the 'title does not revert but re-
mains in the city, the mere fact that the result of a prop-
er legislative act is to put the use of property in private
control would not warrant interference by injunction.

" 'The vacated portion of the street had been laid
over the Trumbull lands. There appears to have been
an opportunity to sell a tract of said land to a company
which would locate extensive works upon it, and so in-
crease the prosperity of that portion of the city. The
required piece of land could not have been obtained with-
out a vacation of this part of York street. This was prob-
ably the principal inducement to the action of common

council. But the motives which induce municipal proceedings of this kind are always of a mixed character. Regard for private interests are necessarily intertwined with public interests.' *Kean* v. *Elizabeth,* 54 N. J. [Law], 462, 24 A., 495.

" 'The fact that, as a consequence of closing the street, private ownership in its bed results, and that provisions are made by the law by which the land can be utilized and rendered valuable, does not convert the main purpose of the legislation from a public to a private one.' *Matter of the Mayor,* 28 App. Div., 143, 52 N. Y. S., 588.

"A like holding was made in the case of *Marshalltown* v. *Forney,* 61 Iowa, 578 [16 N. W., 740]:

" 'Now, if the vacation of a street puts an end to the public use, it certainly cannot affect the power of the city to vacate, that the vacation was made for the purpose of devoting the vacated street or alley to a private use. If the power to vacate is otherwise rightfully exercised, and no private rights are injuriously affected, it is not material what object is intended to be promoted by the vacation.' "

The cases of *Pepper* v. *Railroad,* 113 Tenn., 53, 85 S. W., 864, and *Stewart* v. *Illinois Central Railroad Co.,* 143 Tenn., 146, 225 S. W., 1042, are relied upon by complainants for their contention, but these cases are not controlling. Neither of them involved the closing of a street. In the Pepper case the use of a street essential to complainant's business was destroyed by the construction of a railway track along it, and, furthermore, the company's charter expressly provided that it should not interfere with the use of streets. With reference to the power of a city council over the streets, the court said:

"The legislative power over the streets of cities is very great, yet an examination of the cases will show that it is not without limitation. Held in trust, as they are, thy cannot be diverted so as to destroy either the public interest or private rights which exist in them."

In that case the court further said: "What we hold is that a public street, either with or without the consent of municipal authorities, cannot be converted into a mere road bed for railroad tracks, over which trains will be constantly operated, to the destruction of the public use, and of the business and property interest of those abutting thereon. Such an appropriation is a complete subversion of the purpose for which the street was opened, and in a case where no damages properly recoverable by these property holders would be commensurate with the injury sustained a court of equity on reason and authority should intervene for their protection."

In the Stewart case the court further said:

"There is practically a concurrent finding by the chancellor and the court of civil appeals that said track, if constructed, would occupy exclusively about one-fourth of Wagner street for a distance of about eight hundred feet, or at least from Beale avenue to Linden avenue, and that such occupation would deprive the public of the use of such part of said street. This finding of fact is well established by the evidence in the cause.

"It is also found by said courts, and practically conceded by the railroad company, that the ingress and egress of several of the complainants owning property on the east side of Wagner street, between Beale avenue and Linden avenue, will be seriously interfered with, if not destroyed, by the construction of said road."

And in referring to the Pepper case the court said: "The difference in that case and the one under consideration is simply as to the *quantum* of the street destroyed; but the principle involved is, in our opinion, the same, for, if the city has authority to permit the railroad to appropriate to its exclusive use one-fourth of the street, it can authorize an appropriation of one-half, and if of one-half, then of the whole."

6. No part of complainants' property will be taken by the closing of the east end of McGhee street, and the only damage which they will suffer, as a consequnce, is the impairment of their easement in said street.

A municipal corporation, unlike a *quasi*-public corporation, is not, unless so provided by statute, required to make provision for damages when exercising the right of eminent domain, or to pursue the method prescribed by the general statute. *Simms* v. *Memphis, Clarksville & Louisville Railroad Co.,* 12 Heisk., 621.

In 10 R. C. L., section 110, p. 126, it is said:

"When the taking is made by the State or by a municipal corporation, no special security is required, since the public faith is pledged, and in the case of a municipal corporation, the entire taxable property within its jurisdiction constitutes an adequate fund to which the owner may without risk of loss resort to compel payment."

In *State Highway Department* v. *Mitchell's Heirs,* 142 Tenn., 58, 216 S. W., 336, wherein the Highway Commission Act was held constitutional, the court quoted the following with approval from *Smeaton* v. *Martin,* 57 Wis., 364, 15 N. W., 403:

"There is a broad distinction between the taking of private property for public use by a town or municipal

corporation and the taking of it by a private corporation, the responsibility of which may be very uncertain. Where the property is taken for public use by a town or municipal corporation which is made liable to the owner for any damages sustained by reason thereof, the taxable property of such town or municipality constitutes a pledge or fund to which such owner may resort for payment in the manner so prescribed by the statute with absolute safety, and hence we must hold that the providing of such a method of enforcing payment in such a case, and out of such a pledge or fund, is the making of just compensation for the property, taken within the meaning of the Constitution.''

There can be no question but that if, in closing Mc-Ghee street, complainants' legal rights are invaded they will have a full and adequate remedy at law, and if a judgment be obtained against the city the council can be compelled to levy a tax to provide for its payment.

In *Illinois Central Railroad Co.* v. *Moriarity,* 135 Tenn., 446, 186 S. W., 1053, it was held that the right of an abutting landowner to ingress and egress between his property and the street and a right of passage in the street bounding his property is an easement in the street; that such easement is private property as much as if it were corporeal property, and that the rights of such abutting owner may not be ignored by the municipality, but must reasonably be observed and compensation paid for injury done them; and that, if such easement is taken away or impaired, without the consent of the property owner, it amounts to a taking of his property for public purposes, for which he is entitled to compensation. Citing *Anderson* v. *Turbeville,* 46 Tenn. (6 Cold.), 158; *Rail-*

153 Tenn.—37.

*road* v. *Bingham,* 87 Tenn., 530, 11 S. W., 705; *Smith* v. *Railroad,* 87 Tenn., 630, 11 S. W., 709; *Hamilton* v. *Rape,* 101 Tenn., 224, 47 S. W., 416; *State* v. *Taylor,* supra; *Coyne* v. *Memphis,* 118 Tenn., 651, 102 S. W., 355.

So, if the viaduct is built by the city and the east end of McGhee street is closed, thereby destroying or impair- ing complainants' easement in said street, they will be entitled to recover of the city such damages as they may have sustained by reason of such injury in an ordinary action at law under the authority of the above cited cases. The question of what damages they will be entitled to re- cover, if any, will arise after this is done, so we need not further consider this question.

7. It was not necessary that the fund with which to pay for the construction of the viaduct be in the treasury of the city when the contract was entered into between the city and the railway company, as contended by com- plainants.

To support their contention complainants rely on the first paragraph of section 28 of the city's charter. This provision reads as follows:

"That no contract, agreement, or other obligations involving the expenditure of money shall be entered in- to, nor shall any ordinance, resolution or order for the expenditure of money be passed by the council, or be authorized by any officer of the city, unless the director of finance first certify to the council or such officer, as the case may be, that the money for such contract, agree- ment, obligation or expenditure is in the treasury to the credit of the fund from which it is to be drawn, and not appropriated for any other purpose, which certificate shall be filed and immediately recorded. The sum so

certified shall not thereafter be considered unappropriated until the city is discharged from the contract, agreement or obligation.''

We are of the opinion that this provision has no application to the contract between the city and the railway company. This contract is executory, and is contingent upon the city raising the fund. It is expressly stipulated that the city shall be under no obligation to begin the construction until provision has been made by it for the fund with which to meet the payment of the construction.

8. It is next urged that the proposed issuance of $250,000 of bonds by the city and the expenditure of the proceeds thereof in building said viaduct is illegal and void for the further reason that the city has exhausted its tax levying power in the appropriation of public revenue for other purposes, and the ordinance attempting to levy the tax for the purpose is on that account void.

The bonds are to be issued on a referendum vote as provided for in section 47 of the charter, the last paragraph of which reads as follows:

''For the payment of any bonds and interest thereon, issued under the authority of any referendum, the Council is hereby authorized and directed to levy sufficient taxes on all the taxable property within the city of Knoxville, over and above all other taxes authorized or limited by law, for the payment thereof.''

We think this is a conclusive answer to complainants' contention that the city has exceeded its power of taxation.

9. We think the city had the power to make a contract with the railway company providing for each party

to pay one-half of the cost of the construction of the viaduct, as hereinbefore indicated, and that the chancellor was correct in so holding, and that the bonds could be lawfully issued.

In 28 Cyc. 634, it is said:

"A municipality, because it is a 'body corporate and politic,' has an inherent power to enter into contracts, just as has a private corporation. This faculty to contract is an essential feature of its life, without which it could not exercise its existence. To this inherent power to contract may be referred all municipal contracts essential to the life of the corporation, as a self-governing community and a local instrumentality of the sovereign for the general purposes of government; and this faculty it may exercise with the State, as well as with natural persons and with other corporations, as in the case of a lease of courtrooms to the State, or a purchase of land from it."

In the absence of express authority, the city has no power "to enter into any contract which is either foreign to the objects for which it was created or not necessary to enable it to carry out the powers conferred upon it." However, an enumeration of powers in the charter "does not necessarily operate as a limitation of corporate powers by excluding those not enumerated." Id. 635.

The rule with reference to the power of the city to settle disputed matters by compromise agreement is fully stated in 18 R. C. L., section 80, p. 775.

The Charter of the city of Knoxville, with reference to streets and bridges, in section 5, subsec. (10), provides that the council shall have power:

"To make all necessary appropriations therefor and to open, alter, abolish, widen, extend, establish, grade, pave or otherwise improve, clean and keep in repair streets, alleys and sidewalks; or to have the same done, and to regulate, establish and keep in repair bridges, culverts, sewers and gutters; to regulate the use of all sewers and sewer connections, and fix service charges therefor; and to make provisions and contracts for lighting the streets, and for erection of all buildings necessary for the use of the city."

And section 5, subsec. (4), authorizes the council "to issue and sell bonds of said city for any public municipal purpose which shall be direct general obligations of the city, and" by ordinance or resolution "to fix the maturity dates thereof, and the interest rate, not to exceed six per cent. per annum: Provided, however, that all ordinances for the issuance of any such bonds under this subsection shall be submitted to the qualified voters of said city and be approved by majority vote thereof."

We think, in view of the foregoing provisions, there can be no doubt as to the power of the city to make the contract with the railway company here involved.

This disposes of all the material questions urged by complainants, and it results that we find no error in the decree of the chancellor, and it is affirmed, with costs.

### On Petition for Rehearing.

This cause is before the court upon the complainants' petition to rehear on two questions, as follows:

(1) That the city should be enjoined from closing the east end of McGhee street by the construction of the Broadway viaduct until an ordinance is passed abolishing that end of said street.

(2)   That under sections 1981 and 1982 of Shannon's Annotated Code it is necessary for complainants' rights to be first condemned, and the damages to which complainants will be entitled must be paid into the office of the city recorder before the east end of McGhee street can be closed.

The first contention above stated was not discussed in the opinion rendered and filed in this cause at a former day of the term for reasons hereinafter to be stated.

The second contention was not stressed in complainants' assignment of error and brief filed.

Now, as to the first contention made in the petition to rehear, the record discloses that in the contract entered into between representatives of the city and the Southern Railway Company, and confirmed by the city council, the city obligated itself as follows:

"To pass all proper and necessary ordinances for closing Broadway (or Broad street, as shown on the blueprint) as a street at grade from approximately the north line of Jackson avenue northwardly to approximately the south line of Depot street, and for the construction by the railway company, as agent for the city in so doing, of a viaduct along Broadway from, to-wit, the north line of Jackson avenue, to-wit, the south line of Depot street, together with the necessary track changes, and generally in accord with the general plan hereto attached and made a part hereof, the work on the viaduct to begin within sixty (60) days from the date of the final passage and approval of the necessary ordinances   .   .   .

"To pass all necessary ordinances to close and forever abandon McGhee street, from that point on the west

where McGhee street enters the property of the railway company; thence eastwardly across the tracks of the railway company to the west line of Broadway.''

By section 5 of the Charter of the city of Knoxville (chapter 412, Private Acts of 1923), it is provided:

''That the city as incorporated under this act shall have power by ordinance,'' among other things, ''to make all necessary appropriations therefor and to open, alter, abolish, widen, extend, establish, grade, pave or otherwise improve, clean and keep in repair streets, alleys and sidewalks; or to have the same done, and to regulate, establish and keep in repair bridges, culverts, sewers and gutters; to regulate the use of all sewers and sewer connections, and fix service charges therefor; and to make provisions and contracts for lighting the streets, and for erection of all buildings necessary for the use of the city.''

The power just above quoted is contained in subsection 10 of section 5 of said charter. So it will be seen that the city has not only contracted to close the east end of McGhee street by ordinance, but that the city's charter expressly provides that it must be so done, and there is no proof in the record tending to show that the city does not intend to close the east end of McGhee street in the manner prescribed by its charter. It was for this reason that this question was not discussed in the opinion. There is no warrant for complainants' assumption that the provisions of the charter will not be complied with. Certainly this court cannot presume, in the absence of proof to the contrary, that the city will not pass the necessary ordinance closing the east end of McGhee street.

Now, coming to the second contention of complainants, which is whether or not it is necessary for complainants' easement in McGhee street to be first condemned under sections 1981 and 1982 of Shannon's Annotated Code, and the damages to which complainants will be entitled be paid into the office of the city recorder before that portion of the street can be closed, we are of the opinion that this contention is not well grounded.

Section 1981 provides: "When the owner of the land through which any street or alley or common is to be extended, requires damages for the same, the mayor and aldermen shall appoint freeholders, not exceeding seven in number, who, after first being sworn, shall examine the premises and assess the damages, and report the same to the mayor and aldermen, who shall cause the said report to be spread upon their minutes by the recorder."

Section 1982 provides: "On payment of said damages into the office of the recorder, for the benefit of the owner of the land, the mayor and aldermen, first allowing said owner a reasonable time therefor, may order the street, alley, or common to be opened."

We are of the opinion that these sections have no application to the facts of the present cause. They apply to cases where the owner's land is taken for the extension of a street. The incorporeal and incidental rights which complainants have in McGhee street are not "land through which any street or alley or common is to be extended." No part of complainants' premises is to be appropriated by the city. Whatever damage complainants may sustain is purely incidental, and results from an impairment or destruction of their easement in the street

to be closed, and no part of the land owned by them will be invaded or taken.

Complainants rely on *Woolard* v. *Nashville*, 108 Tenn., 353, 67 S. W., 801, to support their contention that their easement in McGhee street must first be condemned under the sections of Shannon's Annotated Code above quoted, and the damages paid into the office of the city recorder, before said street can be closed.

We do not think this case is controlling. That was an action brought to recover damages for the appropriation of a part of plaintiffs' lot for the construction of a viaduct built along and over a portion of Church street in the city of Nashville, which ran in front of their lot. The lot which belonged to the plaintiffs extended to the middle of the line of the street, and therefore, in constructing the viaduct, a portion of plaintiffs' property was actually appropriated by the city; while in the instant cause no part of the lots or premises of complainants will be appropriated. Any damages which they may sustain by reason of the impairment or destruction of their easement in the portion of McGhee street to be closed are purely incidental, to recover which they will have a plain and adequate remedy at law, as heretofore expressly held in the opinion of this court rendered and filed in said cause.

The petition to rehear is therefore denied, with costs.